(164 App. Div. 51)

PHARAOH v. BENSON et al.

(Supreme Court, Appellate Division, Second Department. October 16, 1914.)

1. INDIANS (§ 27*)—ACTIONS—RIGHT OF INDIAN OR TRIBE TO SUE.

    In the absence of express statutory authority therefor, no action will lie in the courts of this state in the name of any tribe of Indians, nor in the name of any member of such tribe, in behalf of himself and all others similarly situated.

    [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. § 27.*]

2. INDIANS (§ 27*)—ACTIONS—BURDEN OF PROOF—STATUTORY PROVISIONS.

    Under Laws 1906, c. 177, authorizing the Montauk Tribe of Indians, in the name of its chief or head, to commence and prosecute actions to establish the right and title of such tribe to any property, but further providing that nothing therein contained shall be held to confer tribal rights or relations upon any individual, and that the question as to the existence of such tribe shall be a question of law and fact to be determined by the court, in an action so brought, the burden of proof rested upon plaintiff to establish that at the time of the commencement thereof such tribe of Indians still maintained a tribal existence and that plaintiff was its chief or head.

    [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. § 27.*]

3. INDIANS (§ 27*) — ACTIONS — SUFFICIENCY OF EVIDENCE — EXISTENCE OF TRIBE.

    In an action to determine the rights of a tribe of Indians in certain land, evidence that since 1885 the two or three families living upon the lands and claiming to be the descendants of the original Indians of that tribe were not living in tribal relations, and never exercised any political or civil rights as a separate nation or tribe, and rarely met together as a community, and then not for the purpose of any distinctive tribal action, that the men earned their living as day laborers and the women by general housework, and that they had adopted the habits and customs of civilized life and become members of a civilized community, with nothing in their usages, manner of living, daily habits, or family life distinguishing them from the general population, supported a finding that such tribe had disintegrated and been absorbed into the mass of citizens, and that at the time of the commencement of the action in 1906 there was no such tribe of Indians.

    [Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. § 27.*]

4. INDIANS (§ 10*)—LANDS—EXTINGUISHMENT OF RIGHTS OF OCCUPANCY BY ABANDONMENT.

    The Indian right of occupation in lands patented subject to such right, whether in the nature of an easement in gross, a license, or a right sui generis, unrelated to any tenure known to the common law, was so far analogous to an easement that cessation of use, accompanied by acts clearly indicating an intention to abandon such use, constituted an abandonment of the right in like manner as a release executed by one compe-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tent to execute it; and hence, where the owner of the land subject to such rights procured releases from the Indians, who thereupon voluntarily removed from the land and abandoned it, the right of occupation was extinguished, whether or not such releases, treated as conveyances of an interest in land, were void under the federal and state Constitutions and laws.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 25, 29, 46; Dec. Dig. § 10.*]

5. INDIANS (§ 20*)—EXISTENCE OF TRIBE—ESTOPPEL TO DENY.

A judgment in a suit to partition land, which had been patented subject to the Indian rights of occupancy, directing a sale of such land subject to the rights and privileges of a tribe of Indians, merely prevented the purchaser from refusing to complete his purchase if any such right existed, and did not estop the purchaser from questioning the existence and extent of such right as against the tribe, who was not a party to the action and the extent of whose rights were not adjudicated.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 53; Dec. Dig. § 20.*]

Appeal from Special Term, Suffolk County.

Action by Wyandank Pharaoh, as Chief and Head of the Montauk Tribe of Indians, against Jane Ann Benson and another, as executrices of Arthur W. Benson, and others. From a judgment for defendants (69 Misc. Rep. 241, 126 N. Y. Supp. 1035), plaintiff appeals upon questions of law and upon the facts. Affirmed.

Argued before JENKS, P. J., and BURR, RICH, STAPLETON, and PUTNAM, JJ.

Allen Caruthers, of New York City, for appellant.

Charles K. Carpenter, of New York City (Alexander T. Mason and George C. Austin, both of New York City, on the brief), for respondents.

BURR, J. [1] This action was commenced in 1906 by Wyandank Pharaoh, as chief and head of the Montauk Tribe of Indians, to determine the rights of such tribe in a tract of about 4,200 acres of land situated at Montauk Point, on the easterly end of Long Island, known as Indian Field. In the absence of express statutory authority therefor, no action will lie in the courts of this state in the name of any tribe of Indians, nor in the name of any Indian, a member of such tribe, suing in behalf of himself and all others similarly situated. Montauk Tribe of Indians v. Long Island Railroad Co., 28 App. Div. 470, 51 N. Y. Supp. 142; Johnson v. Long Island R. R. Co., 162 N. Y. 462, 56 N. E. 992.

[2] The only enabling act permitting such an action was passed in April, 1906 (Laws 1906, c. 177. The title of such act is:

"An act to enable the Montauk Tribe of Indians in the name of their chief or head to maintain actions in the courts of this state to establish and enforce their rights in and to certain real and personal property."

The enacting clause authorized and empowered the Montauk Tribe of Indians, in the name of its chief or head, to—

"commence, maintain and prosecute in the courts of this state, any action or actions, proceeding or proceedings, at law or in equity, against any person or

persons, corporation or corporations, whatsoever, to establish the right, title and interest of the said Montauk Tribe of Indians in and to any property, real or personal, or to any easements in such real property."

It is apparent, therefore, that to maintain this action the burden of proof rested upon plaintiff to establish that at the time of the commencement thereof the Montauk Tribe of Indians still maintained a tribal existence, and that Wyandank Pharaoh was the chief or head thereof. To guard against the contention that such act might be equivalent to a legislative recognition of the existence of such facts, the act further provided:

"Sec. 3. Nothing in this act contained shall be held to confer tribal rights, or relations upon any individual or individuals and the question as to the existence of the Montauk Tribe of Indians shall be a question of law and fact to be determined by the court."

In each respect plaintiff has failed. The learned court at Special Term has found, upon evidence which abundantly sustains such finding, that long before the commencement of this action, and not later than 1885, "the Montauk Tribe of Indians has disintegrated and been absorbed into the mass of citizens, and that at the time of the commencement of this action there was no tribe of Montauk Indians," and refused to find, as requested by plaintiff, that Wyandank Pharaoh is now "recognized and is generally recognized by the said Indians as their chief or head."

[3] The evidence establishes that since 1885 the two or three families then living upon Indian Field, and claiming to be descendants of the original Montauk Indians, although the purity of blood was greatly impaired by miscegenation, particularly with the negro race, were not living in tribal relations, that they never exercised any political or civil rights as a separate nation or tribe, and that in that period they rarely met together as a community, and then not for the purpose of any distinctive tribal action. The evidence establishes that the men earned their living as day laborers, and the women by general housework. There is an entire absence of evidence of a distinct Indian tribal life, government, or customs; but, on the contrary, it clearly appears that they have adopted the habits and customs of civilized life, and become members of a civilized community, with nothing in their usages, manner of living, daily habits, and family life which distinguishes them from the general population.

[4, 5] In 1878, an action was commenced by Robert M. Grinnell against Edward M. Baker and others, who were the successors in interest of the original patentees of Indian Field, subject to the Indian rights of occupancy, for a partition and division thereof. In 1879, judgment was entered in said action, directing a sale of said land "subject to the rights and privileges of the Montauk Tribe of Indians." At the sale held under said judgment in October of that year, Arthur W. Benson became the purchaser, subject as aforesaid, of the entire tract. Thereafter, and about 1885, he opened negotiations with the few Indians then remaining upon Indian Field, which resulted prior to 1887 in all of them voluntarily removing therefrom and abandoning the same. In connection therewith, he obtained at that time,

or subsequently thereto, from each individual so removing, a conveyance of any rights which he might have in said land. The complaint alleges that such conveyances were obtained "by fraud and by undue influence." The court at Special Term has found:

"That each and all of the releases and instruments  *  *  *  were voluntarily executed and delivered by the said Indian grantors thereof in good faith and for good and valuable considerations, and were not obtained by any fraud, undue influence, or duress."

The evidence establishes that, not only was no fraud practiced by Arthur W. Benson or his successors in interest, nor any misrepresentation made by any one authorized to represent him or them, but, on the contrary, that the grantors therein were treated with great fairness, if not generosity, in connection therewith. In each instance other land was conveyed to them, near to the village of East Hampton, where a better opportunity is afforded them of earning a livelihood, accompanied by cash payments, either of a lump sum or an annuity. We are convinced that the present condition of the grantors in the deeds to Benson is far better than if they were allowed to return to their former dwelling place in Indian Field.

We do not deem it necessary to determine whether, treated as conveyances of an interest in land, these instruments are within the prohibition of the federal Constitution and statutes, the state Constitution, and the Penal Law. Const. U. S. art. 1, § 8, subd. 3; Rev. St. U. S. § 2116; Const. N. Y. art. 1, § 15; Penal Law (Consol. Laws, c. 40 [Laws 1909, c. 88]) § 2030. If we concede for the sake of the argument that such is the fact, the Indian right of occupation could certainly be lost by abandonment, and this whether such right was in the nature of an easement in gross, a license, or was "sui generis," and unrelated to any tenure known to the English common law. Such abandonment took place voluntarily, and was complete by the year 1887. We think that this right was so far analogous to an easement that cessation of use, accompanied by acts clearly indicating an intention to abandon such use, would be operative, without reference to the time of cessation, in like manner as a release executed by one competent to execute the same. Welsh v. Taylor, 134 N. Y. 450–455, 31 N. E. 896, 18 L. R. A. 535.

We agree, also, with the learned court at Special Term, that the fact that the judgment in Grinnell v. Baker, under which Benson bought, contained a provision to the effect that the property be sold "subject to the rights and privileges of the Montauk Tribe of Indians," and that the deed to him contained a similar clause, did not create an estoppel either by judgment or "in pais." The Montauk Tribe of Indians was not a party to said action, and there was no adjudication as to the extent of their rights, if any. Its only effect was to prevent the purchaser at the sale from refusing to complete his purchase, if any such right did exist. It left him entirely free to question both the existence and the extent thereof.

The judgment should be affirmed, without costs. All concur.