## UNITED STATES v. NATIONAL GYPSUM CO. et al.

### No. 97.

Circuit Court of Appeal, Second Circuit.

March 31, 1944.

Finck & Huber, of Buffalo, N. Y. (Elmer E. Finck and John F. Huber, Jr., both of Buffalo, N. Y., of counsel), for defendant-appellant National Gypsum Co.

Nathaniel L. Goldstein, Atty. Gen. (Orrin G. Judd, Sol. Gen., of Albany, N. Y., and Henry S. Manley, Asst. Atty. Gen., of counsel), for defendant-appellant People of New York.

Norman M. Littell, Asst. Atty. Gen., and Vernon L. Wilkinson and Roger P. Marquis, Attys., Department of Justice, and George L. Grobe, U. S. Atty., all of Washington, D. C., for the United States.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The United States brought suit at the request of the Secretary of the Interior on behalf of the Tonawanda Tribe or Band of Seneca Indians to have two leases of lands

in their Reservation in Western New York which are held by the defendant, National Gypsum Company, declared void. The People of the State of New York were made a party to the suit. Both the National Gypsum Company and the State interposed answers praying that the complaint be dismissed.

The District Court held that the leases and Section 85 of the Act of the New York Legislature approved February 17, 1909, Indian Law, Consol. Laws, c. 26, § 85, under which the leases purported to be made, were void, granted judgment in favor of the United States to that effect and ordered the National Gypsum Company to account for the value of minerals mined and removed from the leased lands. Both the Gypsum Company and the State have appealed from the judgment. In our opinion the leases and the Act of the New York Legislature under which they were authorized were valid. The judgment should, therefore, be reversed and the complaint dismissed.

The Tonawanda Band of the Seneca Nation was one of the Indian tribes of the Six Nations. In 1784, 1789 and 1794, the United States concluded three treaties with the Six Nations. 7 Stat. 15, 33, 44. Under these treaties certain described lands in the United States were recognized as the Reservation of the Indians to "remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." By the treaties the United States agreed to pay an annuity to the Indians. The Treaty of 1794 described the Reservation of the Senecas.

Thereafter it was proposed to move the Tonawanda Band to a reservation in Kansas, but they did not accede to the proposal and as a result, under a subsequent treaty between the Band and the United States made on November 5, 1857, and ratified by the Senate on June 4, 1858, 11 Stat. 735, the Tonawandas relinquished to the United States all claim to the lands in Kansas for $256,000.

It was provided by the Treaty of 1857 that the Tonawanda Band might purchase a Reservation in New York for the sum of $256,000, or such part as they might choose to use for that purpose. Under Article III of this Treaty title to the lands so purchased was to be taken by deed to the Secretary of the Interior "to be held by him in trust for the said Tonawanda Band of Indians and their exclusive use, occupa-

tion and enjoyment, until the legislature of the State of New York shall pass an act designating some persons, or public officer of that State, to take and hold said land upon a similar trust for said Indians; whereupon they shall be granted by the said Secretary to such persons or public officer." The Tonawandas expended $165,000 of the moneys they received from the Kansas lands in acquiring about 7,549 acres in the New York Reservation, the title being taken in the name of the Secretary of the Interior. He held the lands thus acquired for the tribe until February 14, 1862, when he conveyed them to the Comptroller of the State of New York "in trust, for the said Tonawanda Band of Indians and for their exclusive use, occupation and enjoyment, in the manner particularly defined in said Treaty". This disposition of the lands was authorized by the New York Legislature under Chapter 439 of the Laws of 1860.

In 1873 the New York Legislature enacted the law which as amended now constitutes Section 85 of the Indian Law of that State. This statute purported to authorize the attorney for the Tonawandas, who is now appointed by the State Board of Charities, pursuant to Section 81 of the Indian law, to sell gypsum on the Tonawanda Reservation, the proceeds to be paid to the United States Indian Agent for the New York Indian Agency for distribution with the annuities paid by the United States. In 1922 a twenty year lease was executed by the attorney for the Indians pursuant to Section 85 and the National Gypsum Company subsequently succeeded to the rights of the lessee thereunder. In 1936 another lease was granted to the National Gypsum Company for a period of fourteen years, to begin at the expiration of the first lease. It was to avoid these leases that the United States brought the present suit.

The decision by the District Court was rendered upon a motion by the United States for summary judgment. Prior to the making of this motion, the United States had moved for judgment on the pleadings, declaring Section 85 of the New York Indian Law and the leases to the National Gypsum Company void; thereupon the People of the State of New York were joined as a party-defendant, filed its answer, as the National Gypsum Company had already done, and National Gypsum Company made a cross-motion on the pleadings for a dismissal of the complaint

on the ground that it failed to state a claim against the Company. These motions were followed by a motion on behalf of the United States for leave to withdraw its motion for judgment on the pleadings and for summary judgment. The next thing that occurred was the filing of the opinion of the District Judge, 49 F.Supp. 206, in which he upheld the position of the United States and declared the provisions of the Indian Law of the State of New York authorizing the leases, and the leases themselves, null and void. His decision was chiefly based on 25 U.S.C.A. § 177, R.S. § 2116, which provides that: "No purchase, grant, lease or other conveyance of lands * * * from any Indian nation or tribe of Indians, shall be of any validity in law or in equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." Thereupon the Attorney General of the State of New York moved upon affidavits for a reargument or a new trial on the issues raised by the pleadings, or such other relief as might be appropriate, and filed affidavits in support of his position. The District Judge thereafter filed a further opinion in which he denied the motion for a reargument or new trial and held that the determining question was "What the legal effect of the deed to the Comptroller of the State of New York was in so far as it gave authority to the State to enact legislation providing for the leasing of the gypsum lands in question; and next whether the statute of the United States forbids the execution of such lease. If the execution of the deed gave the authority aforesaid, the statute would not apply. On the other hand, if the deed did not give such authority in my view, the statute controlled. * * * Admitting all the matters set out in the moving affidavits, the conclusions heretofore arrived at must stand."

The State contends that upon the proofs before the court summary judgment was improper and that the parties should be afforded an opportunity "to present either by trial or affidavits, the factual and historical setting of the New York Indian Law, Sec. 85." In reply, it is argued on behalf of the United States, that "the question is purely one of law and, to the extent that the facts asserted in the affidavits are material, they will be considered on the appeal. A trial would serve no purpose. Hence this was obviously an appropriate case for summary judgment. The appellant company recognizes this fact for it contends (Brief 3) that its motion for judgment on the pleadings should have been granted."

■ From the above contentions of the parties it seems obvious that the United States in moving for summary judgment does and can raise no question as to the propriety of that mode of procedure, nor do we think the defendants in whose favor we are deciding this appeal are in a position to complain since they are obtaining a dismissal of the complaint. Indeed they both ask among other things that the judgment of the District Court be reversed and the complaint dismissed.

■ The Tonawanda Indians were determined to resist the arrangement to remove them to the West, and were intent upon retaining a reservation in the State of New York, and in carrying out this intention they were supported by various eminent citizens of that State and other parts of the country. In a document summarizing the results of a conference with the Commissioner of Indian Affairs held in 1857, it was stated in enumerating the benefits of the Indians of exchanging Kansas lands for New York lands: "They will be at peace and the owners of their homes secured to them against improvident alienation by the Constitution and laws of New York: the Genl. Govt. will be relieved from the necessity of further superintendence and care over them; and the Ogden Company will be satisfied by a just consideration in money for their claims to the reservation." As a result of this protest an agreement was made between the Commissioner of Indian Affairs and the Chief of the Tonawandas and their agents whereby the Tonawandas agreed to give up to the United States all claims to the lands in the West and all claims for the payment of any money. This was followed by the Treaty of 1857 whereby the 7,549 acres in the New York reservation were acquired in the name of the Secretary of the Interior to be held "in trust" for the Band, until the legislature of the State of New York should pass an act designating someone to receive the land upon a similar trust. The District Court held that the trust thereafter assumed by the Comptroller of the State of New York pursuant to the Treaty of 1857 and the subsequent New York legislation in conformity with that treaty was a "dry" or "passive" trust because of the New York statute relating to permissible trusts and that the title therefore vested not in the

Comptroller as trustee but in the Tonawanda Band itself. This was plainly a mistaken view of the effect of the transfer, for the very New York Statute of 1860, chap. 439, p. 762, which authorized the Comptroller to take title in trust, concluded with the words: "Anything in the Act of the Legislature of this State, defining the purpose for which trusts may be created to the contrary notwithstanding." In other words, the Secretary of the Interior and the Comptroller, as his successor, had whatever powers may fairly be implied from the nature and purpose of the transfers and from the practical construction of the powers in question by the parties.

To determine the extent of these powers is by no means an easy matter. The Tonawanda Tribe has had a history that is unique in respect to its relations with the United States and the State of New York. From the very origin of the attempt to move it West, it insisted upon remaining on its New York reservation, and never through its chief acceded to the treaty for removal, which other chiefs of the Seneca Nation entered into. Doubtless because there had been a governmental plan to move the Tonawandas to the West, which was carried out in the case of many Indian Tribes, they preferred to arrange for protection by the State of New York on their old reservation rather than to remain under the immediate control of the United States with which they had had some friction. While there can be no question but that the United States could have controlled the Tonawandas if it had thought best, we are inclined to think that it deliberately left a large measure of control in respect to the reservation to the State of New York. There can be no other explanation of the arrangement for transferring the Tonawanda Reservation from the Secretary of the Interior to the Comptroller of the State of New York, or of the continued recognition by the Federal authorities of the exercise of State supervision over that reservation. Ever since 1862 there have been statutory enactments by the State regarding the administration of the Reservation of the Indians and for some seventy years there have been provisions relating to sales of gypsum from that Reservation.

As early as 1864 the Commissioner of Indian Affairs in his annual report referred to the adoption by the Senecas of a republican form of government and written constitution and said that it was: "Done under proper authority from the State of New York conferring * * * powers of incorporation", and that "it was duly reported to this department and fully recognized by it."

On July 15, 1873, Acting Commissioner H. R. Clum wrote the United States Indian Agent who had sent him a copy of Chapter 394 of the Act of May 2, 1873, of the Legislature of the State of New York relating to the sale of gypsum from the Tonawanda Reservation. The agent had inquired about the disposition of receipts from sales of gypsum, and had asked whether it was proper for him to receive a five per cent commission for disbursing the funds as provided under the New York law. The Acting Commissioner replied: "This is a matter entirely between yourself and the State of New York, and * * * this office knows of no objection to your acceptance of the percentage.

"Your accounts of the funds received and disbursed by you, arising from the sale of this material, should be kept separate."

By Chapter 744 of the Laws of 1873 the Comptroller was authorized to deed eighty acres of the Reservation to trustees for a Manual Labor School for the benefit of the Tonawandas. A contribution of $3,000 was received in aid of the enterprise from the treasury of the Tonawandas. The land was conveyed by the Comptroller and the buildings were erected. This project and other matters in which State legislation was enacted in respect to the property and affairs of the Tonawandas were discussed in the letters between the Indian Agent and the Commissioner, with approval of the latter.

In a letter of March 10, 1898, Acting Commissioner Tonner wrote the Secretary of the Interior as follows: "It has been the purpose and policy of this office for some years to limit its dealings with the New York Indians * * * having always a due regard for the State laws." In 1901 the Commissioner of Indian Affairs included at pages 287, 288 of his annual report a report from the Indian Agent Ferrin in which we find the following observation: "There are a few good farmers on the reservation, but a considerable part of the land is worked by whites under leases from individual Indians. The State law authorizes these leases, permit having been grant-

ed by the council of said nation or tribe and having been approved by the attorney of the tribe."

On May 18, 1899 the Standard Plaster Co. of Buffalo made a contract with the Tonawandas for mining gypsum on their Reservation. It was made pursuant to Chap. 679 of the New York Laws of 1892, as amended by the Laws of 1899, c. 315, through the attorney of the Indians and was to last for twenty years. Under Sec. 84 of Chap. 679 of the Laws of 1892 the proceeds of sales of gypsum were to be paid by the attorney of the Indians to the United States Agent, added to the annuity granted by the United States to the Tonawandas and distributed to them at the same time and manner as such annuity. This transaction was approved by the Secretary of the Interior. On August 10, 1901, Acting United States Commissioner Tonner wrote the Secretary of the Interior recommending that authorization be granted the Indian Agent to distribute per capita to the Tonawanda Indians the sum of $750 derived from the sale of gypsum, and Acting Secretary Ryan authorized this distribution by letter dated April 13, 1901. The reports of 1902–1903 refer to similar distributions of gypsum money.

Some time later the Commissioner of Indian Affairs was asked by the Council as to the legality of their employing attorneys for a contingent fee to make the claim that the gypsum rentals should be distributed to the individual Indians owning allotted lands from which gypsum was removed rather than to the tribe as a whole. The Commissioner replied by letter of January 19, 1928: " * * * the State is the guardian of the lands of the Tonawanda Indians, and the State legislature has passed laws for their government. * * * In view of the facts that this case does not involve a federal question and the Indian lands are held in trust for them by the State of New York, it is believed that your contract with the tribe is sufficient to enable you to proceed."

It is also evident from the original and supplemental affidavits of Mr. Manley, Assistant Attorney General of the State of New York, that the Commissioner of Indian Affairs and the Department of the Interior considered that lands on the Tonawanda Reservation might be leased to mine gypsum under the provisions of the New York Indian Law. This law was enacted upon the theory that the reservation conveyed in trust to the Comptroller was subject to legislative regulation by the State of New York because of the official character of the Comptroller.

Moreover, it is significant that the Act of February 28, 1891, 26 Stat. 794, 25 U.S.C.A. §§ 331, 336, 371, 397, providing for leasing certain Indian tribal lands for grazing and mining purposes upon such terms as the agent in charge of the reservation might recommend "subject to the approval of the Secretary of the Interior" excepted the Reservations of the Seneca Nation. Congress had ratified various leases by that nation in Alleghany County, the validity of which we recognized in United States v. Forness, 2 Cir., 125 F.2d 928, but Congress apparently had left the making of leases on the Tonawanda Reservation to State authority. This led Assistant Attorney General Van Devanter to advise the Secretary of the Interior on May 4, 1900 that the provisions of the Act of February 28, 1891 did not affect any of the Reservations of the Seneca Nation of New York Indians.

█ For many years it has been the understanding of the Department of the Interior, the Commissioner of Indian Affairs and the State authorities that the Tonawanda Reservation stood in a unique position and that its transfer to the Comptroller in trust empowered the State to provide for leases of reservation lands and that leases of such lands have been made under a comprehensive plan set up under State authority and warranted by the terms of the original treaty with the Tonawandas. It is not doubted that Congress could make other provisions for the disposition of the lands of the Tonawandas and can make them for any further leases, but until it does so we think that a status so long maintained with the approval of the United States government should be recognized and is not in contravention of 25 U.S.C.A. § 177, R.S. § 2116. United States v. Midwest Oil Company, 236 U.S. 459, 481, 35 S. Ct. 309, 59 L.Ed. 673. It is to be remembered that no contention has been made that the leases in question are in any respect inequitable.

Accordingly we hold that the judgment for the plaintiff below should be reversed and the complaint dismissed.