ROBERT T. WOOD, Appellant, *v.* CITY OF SALAMANCA, Respondent.

Argued October 20, 1942; decided December 3, 1942.

*John W. Ellis* and *Orla E. Black* for appellant.

*J. M. Seymour* for respondent.

LEWIS, J.  In a submitted controversy upon an agreed statement of facts a taxpayer, as plaintiff, and the city of Salamanca as the sole defendant, seek a declaratory judgment determining the following questions: (1) Did the Legislature have the power under the State and Federal Constitutions to pass chapter 231 of the Laws of 1942?  (2) If the act is declared constitutional, has the Legis-

lature the power to declare to be a local tax the rent reserved in leases between the Seneca Nation of Indians and lessees of lands within the corporate limits of the city of Salamanca and on the Allegany Reservation, and to authorize the city to levy said rent as such tax and pay the same to the Seneca Nation of Indians? Each of the above questions was answered in the affirmative by the Appellate Division, one justice dissenting.

Upon the present appeal by the plaintiff the following facts are among those stipulated: The city of Salamanca, in Cattaraugus county, is located on the Allegany Indian Reservation — a tract of 30,000 acres reserved to the Seneca Nation of Indians by the treaty by Robert Morris made at " Big Tree " on September 17, 1797. Due to its favorable location at the junction of several railroads, Salamanca in its early history enjoyed more than normal growth. In 1875 it was a community of 2,000 inhabitants most of whom lived on land then claimed to have been leased under the sanction of the Seneca Nation or from individual Indians who claimed allotments from that nation. When the legality of those leases was challenged the Congress enacted a statute (18 Stat. 330 [1875]) which was designed to validate certain existing leases but only for a period of five years. At the end of that term possession of lands within an area comprising 3,000 acres reverted to the Seneca Nation which in turn was authorized to lease the same for terms not exceeding twelve years. During the ten years following 1875 the population of Salamanca increased until it reached 4,000. Meantime, however, it was found that the growth of the community and its ability to attract industry were handicapped by the short terms of the leases mentioned above which prevented the obtaining of loans upon real estate. In 1890 an act of Congress (26 Stat. 558, ch. 1132) authorized the Seneca Nation to renew leases of its reserved lands for a term not exceeding ninety-nine years. Under long-term leases thus authorized the community's growth continued until, in 1939, its population approached 10,000; its assessed valuation of real property, franchises and public utilities was in excess of $6,000,000; it raised annually by taxation more than $300,000 and it had a bonded debt of more than $330,000.

In the year 1939 the holders of a large number of long-term leases of Indian lands had failed to pay the annual rentals due thereunder

It was because of these defaults that on March 4, 1939, the Seneca Nation, by resolution of its Council, forfeited all leases it had granted upon which annual rentals were then in arrears. The resolution of forfeiture was adopted without notice to or demand upon the lessees and with no opportunity given them to tender the rentals then past due, with interest. When, after the adoption of the resolution of forfeiture, such tenders were made to the United States Indian Agent, they were refused and thereafter the legality of such refusals was given judicial approval. (*United States* v. *Forness*, 125 Fed. Rep. [2d] 928.) Since 1939 the Council of the Seneca Nation has annually adopted a resolution forfeiting, without notice or demand, all leases upon which there were defaults in the payment of annual rentals due on or before February nineteenth of each year. As the result of such action the forfeiture of many leases has been declared, and due to such forfeitures the leased land involved has in each instance reverted to the Seneca Nation and is thus beyond the power of the city to tax. (18 Stat. 330, ch. 90, § 8.)

These forfeitures and consequent reversions — now 800 in number — involving as they do the withdrawal from the list of taxable property of each parcel of leased land thus affected, have created for the city a critical situation. Under the provisions of its present Charter and by reason of defaults in the payment of taxes, the city sells each year parcels of such leased land, and, in the absence of other bidders, the city Comptroller bids in for the city the property involved. The city, claiming to be the owner of more than 200 parcels of land thus sold for taxes, is without knowledge as to whether the rentals reserved on the leases have been paid to the Seneca Nation. It is said that if such rentals are in default a purchaser at a tax sale, including the city, cannot protect a tax title because of the forfeiture of the lease for nonpayment of rentals and the refusal of the United States Indian Agent to accept rentals due after February nineteenth of each year.

By reason of the foregoing facts and the alleged danger that the city may from year to year lose more of its assessable property as a result of the forfeiture of leases by the Seneca Nation; because of the alleged necessity placed upon the city to preserve upon its assessment rolls all remaining valid leases; because of what is said to be the probable inability of the city under present conditions to mar-

ket issues of its bonds, and believing that its corporate existence is threatened, the city was instrumental in procuring the passage of chapter 231 of the Laws of 1942. Without analyzing the statute in detail it may be said that in general it declares all rentals reserved to the Seneca Nation of Indians in what are termed " Indian leases " of lands within the city of Salamanca to be a lien in favor of the city, so long as said leases or renewals thereof are in force. The statute also purports to authorize the city, prior to February nineteenth of each year, to pay the aggregate sum of all rents reserved in such leases and to levy a tax against the property affected to reimburse the city for rentals thus paid.

We cannot say that the two questions before us upon this appeal, upon which a declaratory judgment is sought, do not involve property rights of the Seneca Nation of Indians, which Nation, although the owner of the leased lands involved, has not been made a party to the present action. Nor can we say that the enforcement of chapter 231 of the Laws of 1942 will not affect legal relations which might arise from that ownership. Indeed, the following excerpt from the brief filed with us by the appellant indicates his own conclusion that property rights of the Seneca Nation and legal relations affecting it, are involved in the present controversy: " The leases granted by the Seneca Nation are contracts with individuals. The city is not a party to those leases. It cannot volunteer to pay the rental for an individual and advance its credit for that purpose. Certainly it cannot do this without the consent of the owner of the lease. There is no provision in the act for such consent. It merely states that the city shall have authority to pay these rentals, whether the property owner wishes it or not."

We do not consider whether the appellant's statement, last quoted above, is either factually or legally correct. We are mindful, however, that a judgment is a determination of the rights of the parties to an action (Civ. Prac. Act, § 472) and that a declaratory judgment, which has the force of a final judgment (§ 473 id.), " serves a legitimate purpose where all persons who are interested in or might be affected by the enforcement of * * * ' rights ' and ' legal relations ' and who might question in a court the existence and scope of such rights, are parties to the action and have opportunity to be heard. As to persons who are not parties a declaratory judgment would be a mere academic pronouncement without

juridical consequence, but which might be embarrassing if attempt is made thereafter to enforce these rights in legal proceedings to which they are parties. A court may, and ordinarily must, refuse to render a declaratory judgment in such case." (LEHMAN, Ch. J., in *Manhattan Storage & Warehouse Co.* v. *Movers & Warehousemen's Ass'n*, 289 N. Y. 82, 88.)

In the circumstances disclosed by the agreed statement of facts — as to the legal consequences of which we make no determination — we conclude that the declaratory judgment sought in the present action, to which the Seneca Nation of Indians is not a party, should not be granted.

The judgment of the Appellate Division should be reversed and the submission dismissed, without costs.

LEHMAN, Ch. J., LOUGHRAN, FINCH, RIPPEY, CONWAY and DESMOND, JJ., concur.

Judgment reversed, etc.