Fleeta J. Andrews, Claimant, *v.* State of New York, Defendant. (Claim No. 28516.)

Court of Claims, May 19, 1948.

*Douglas L. Manley* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Marvin P. Lazarus* of counsel), for defendant.

GORMAN, J.   Claimant brings this action as an enrolled member of the Onondaga Nation, not residing on the reservation. As such, she alleges she was the possessor of certain rights in communal lands of said nation, which have been abridged.   She demands a judgment against the State of New York because it purchased some of said land and paid the agreed price to the Council of Chiefs who distributed the proceeds equally among the enrolled members of the tribe living on the reservation.

The defendant moves to dismiss the claim on several grounds including failure to state facts sufficient to constitute a cause of action; that the claimant has failed to establish any obligation running between the claimant and the State of New York as a third party; and, that the court lacks jurisdiction of the matter.   Upon this motion, the material allegations of the claim must be deemed to be true.

The hereditary lands of the Six Nations, comprising the Iroquois Confederacy, were principally in what is now the State of New York, but through their supremacy in arms and political acumen they extended their territory far beyond these boundaries.   Their stubborn resistance ultimately secured recognition of their claims to independence and territorial rights from France and England.   They were recognized in most places as sovereign allies of the crown and were primarily instrumental in excluding their territory from French occupation.   They never acknowledged dependency to the provincial Government.

The Onondaga Nation was the founder of the Iroquois League, or Ho-de-no-sau-nee.   The original three tribes were

the Onondagas, Mohawks and Senecas. Later, the Oneidas separated from the Onondagas, and the Cayugas from the Senecas. Considerably later, the Tuscaroras were admitted to membership, but without representation in the general council. Their civil authority was administered by fifty chiefs divided unequally among the five nations. There were also chiefs who rose to power as war chiefs, or because of individual eloquence and wisdom. Chiefs were named by each tribe subject to confirmation by the general council. The presiding officer of the council was always a member of the Onondagas, as founders of the league. Their principal war chief was always a Seneca. This council seated fourteen chiefs from the Onondagas, ten from the Cayugas, nine each from the Mohawks and Oneidas, and eight were Senecas.

The Onondaga chiefs are chosen by the various clans of the tribe, the matriarchs of each clan selecting the number allowed under their form of government. These chiefs, after installation, may be deposed in an orderly way by those who have chosen them. By common usage, chiefs and sachems have become synonymous, although " sachem " is an Algonquin title, not utilized by the Iroquois, themselves.

The State of New York, before and after the adoption of the Federal Constitution, assumed the independent right of entering into treaties with the Six Nations for the acquisition of their lands. Under the general principles laid down by Chief Justice Marshall, in *Johnson* v. *M'Intosh* (8 Wheat. [U. S.] 543) it was necessary in such cases to extinguish the Indians' right of perpetual occupancy. This, the State of New York proceeded to do by treaties. On September 12, 1788, at Fort Schuyler (formerly Fort Stanwix), the Onondaga Nation, by treaty, ceded its lands to the State, except for a one hundred square mile area adjoining Salt Lake (now Onondaga Lake).

On March 11, 1793, at Onondaga, by treaty, it ceded about three quarters of the above reservations and by treaty dated July 28, 1795, at Cayuga Ferry, it ceded Salt Lake and a mile strip around the lake, together with other lands.

On February 25, 1817, at Albany, it ceded 4,320 acres of the remainder, and on February 11, 1822, at Albany, 800 acres more. The entire purchase price of the above was $33,380 in money, $1,000 in clothing, an annuity of $2,430, and 150 bushels of salt. The remaining lands, comprising about 7,300 acres, constitute the present Onondaga Reservation.

The United States Government, on October 22, 1784, at Fort Stanwix, concluded a peace treaty with the Six Nations and received them, including the Onondaga Nation "into their protection". (7 U. S. Stat. 15.) On January 9, 1789, at Fort Harmar, another Federal treaty confirmed lands and boundaries (7 U. S. Stat. 33) and on November 11, 1794, at Kon-on-daigua (Canandaigua), the United States acknowledged the lands reserved to the Onondaga Nation in their prior treaties of 1788 and 1793, with the State of New York, to be their reservations and property "until they choose to sell the same to the people of the United States, who have the right to purchase." (7 U. S. Stat. 44.) The United States has never similarly acknowledged subsequent treaty grants from the Onondagas to the State, although subsequent treaties were made by it with the Six Nations in 1838 and 1842, and a long series of treaties were made with Indian tribes until the practice was abolished in 1871. (16 U. S. Stat. 566.) Since that date, dealings between the United States and the Indians has been by acts of Congress, but such acts and treaties are of like force. (*Whitney* v. *Robertson,* 124 U. S. 190; *Shongo* v. *Miller,* 45 App. Div. 339, affd. 169 N. Y. 586.) The treaty of 1794 did not create the Onondaga Reservation, but confirmed the Onondagas' aboriginal right of possession. At all times the rights which belong to self government have vested in these Indians. Their right of occupancy has never been questioned, but the fee in the soil is in the State of New York. This is a right of ultimate domain, with the right of perpetual and exclusive occupancy in the Indians. Such right is hardly less valuable than title in fee and without extinguishment no beneficial interest could be conveyed. For all practical purposes, the tribes owned the land. Title to these lands was never in the Federal Government, but the Onondaga Indians remaining in New York and occupying the land reserved to them by treaty with the State, constituted a distinct tribe or nation. The relation of these Indians to the United States and State is marked by peculiar and cardinal distinctions which exist nowhere else. In *United States* v. *Boylan* (265 F. 165, 171) the court said: "Since the Indians exist as a separate band or tribe, and therefore as a separate nation, the exclusive jurisdiction over the Indians is in the federal government, and the right to maintain an action in their behalf under the federal Constitution is solely vested in the federal government. *Heckman* v. *U. S.,* 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820."

It may be that these Indians were wards of this State at the time it became an independent sovereignty on the adoption of the Declaration of Independence and as successor to the British Crown before the adoption of the Constitution, but by provision of section 8 of article I of the United States Constitution, Congress was expressly authorized to regulate commerce of the Indian tribes and " long continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territories subsequently acquired, and whether within or without the limits of a State." (*United States* v. *Sandoval,* 231 U. S. 28, 46.) The nature of this relationship between the United States and these Indians is that of guardian and ward (*Heckman* v. *United States, supra; United States* v. *Kagama,* 118 U. S. 375; *United States* v. *Sandoval, supra*) and this jurisdiction is paramount and exclusive. (*Worcester* v. *State of Georgia,* 6 Pet. [U. S.] 515; *United States* v. *Boylan,* 265 F. 165, *supra; United States* v. *City of Salamanca,* 27 F. Supp. 541, 545.)

" It will thus be observed that not only has the United States government the sole power to act as the guardian of the Indians of the state whose tribal relations still exists; but it has the sole power to legislate as to the distribution of their lands." (*United States* v. *Boylan,* 265 F. 165, 173, *supra.*)

The courts of this State, as well as the Federal courts, have consistently recognized that this paramount power in Congress is applicable to the affairs of the Six Nations within New York State, and has never been relinquished. (*People ex rel. Cusick* v. *Daly,* 212 N. Y. 183; *Mulkins* v. *Snow,* 232 N. Y. 47; *Matter of Patterson* v. *Council of Seneca Nation,* 245 N. Y. 433.)

On the other hand, as stated in *People ex rel. Ray* v. *Martin* (294 N. Y. 61, 72) " It would take too long to list the various assumptions by New York State of various kinds of control over the Indians themselves, and the ratifications and recognitions thereof by the Federal Government and courts." Learned proponents of State prerogatives argue that as a practical matter after 1784, the power of making peace with the Indians rested with Congress, and the power of buying their lands within its borders, with New York State, at least, under the Articles of Confederation. These articles gave Congress the sole and exclusive right and power of regulating the trade and managing

all affairs with the Indians. The Constitutional provision of 1787 provided " The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". The Federal courts follow the State courts on all questions except those governed by the Constitution, an Act of Congress, regulations made thereunder, or a treaty. (*Erie Railroad Co.* v. *Tompkins,* 304 U. S. 64 [1938].) But in the above exceptions, the Federal court's interpretation is controlling, and State courts are bound to follow it. As stated by Mr. Justice HOLMES in *Davis* v. *Wechsler* (263 U. S. 22, 24) " the assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice." (See *American Railway Express Co.* v. *Levee,* 263 U. S. 19; *Adams Express Co.* v. *Croninger,* 226 U. S. 491; *Davis* v. *Wechsler, supra.*)

As Judge POUND stated in *Mulkins* v. *Snow* (232 N. Y. 47, 50, *supra*) : " The general question of the power of the state to legislate for the tribal Indians living on reservations is full of doubt and confusion." However, to the extent that Congress has occupied this field, the State is excluded from jurisdiction. A distinction exists between Indians who maintain their tribal integrity and recognize their tribal relations and those who do not, and the Six Nations have a different relationship with the State and Federal Governments than other Indians. (*United States* v. *City of Salamanca,* 27 F. Supp. 541, *supra; Matter of Patterson* v. *Council of Seneca Nation,* 245 N. Y. 433, *supra,* revg. 219 App. Div. 857; *Woodin* v. *Seely,* 141 Misc. 207, affd. 238 App. Div. 766; *United States* v. *Forness,* 37 F. Supp. 337.) The above cases are authority that Indian laws and customs control in all internal affairs of the tribe, when not expressly provided otherwise by statute. " The tribal Indians, being wards of the National Government, are not generally amenable to State laws". (*People ex rel. Ray* v. *Martin,* 294 N. Y. 61, 69, *supra.*)

The Government has frequently recognized the right of the State to deal with Indians within its boundary (*People of State of N. Y. ex rel. Kennedy* v. *Becker,* 241 U. S. 556), but much of this recognition with reference to the Six Nations flows from exercise of police power and came after the adoption of their constitution by the Seneca Nation in 1848. This constitution, which in effect incorporated the tribe, was assented to by the United States and the State of New York the following year, but the Seneca Nation itself created the system of government set up therein. There still remained, however, to the Seneca

Nation a rather large measure of sovereign power over its own affairs. The statutes to be enacted upon invitation of the nation were to be consistent with their constitution. (*Matter of Patterson* v. *Council of Seneca Nation*, 245 N. Y. 433, 443, *supra.*) Unlike the Senecas and other tribes, who did likewise, the Onondaga Nation has never accepted or relied upon the State courts, but has retained its tribal integrity, its government by Council of Chiefs, and has clung to the old order of things with great tenacity. In most instances it has retained its autonomy. (*Nephew* v. *State of New York*, 178 Misc. 824.)

The general rule seems to be that a tribe cannot sue or be sued in this State, except where authority has been conferred by statute. (*City of Salamanca* v. *Seneca Nation*, 47 F. Supp. 939.) Likewise, a suit cannot be brought by an individual in the name of the tribe in the absence of statutory authority (*Johnson* v. *Long Island R. R.*, 162 N. Y. 462; *Pharoh* v. *Benson*, 164 App. Div. 51, affd. 222 N. Y. 665), or by a portion of the tribe separated therefrom. (*People ex rel. Cayuga Indians* v. *Board of Comrs. of Land Office*, 99 N. Y. 648; *Cayuga Nation* v. *State of New York*, 99 N. Y. 235.) It has, however, been recognized that the jurisdiction of the State may operate or apply, to some extent, with respect to Indians, or Indian Reservations in the State. (*France* v. *Erie Ry. Co.*, 2 Hun 513; *People ex rel. La Forte* v. *Rubin*, 98 N. Y. S. 787; *Bishop* v. *Barton*, 2 Hun 436, affd. 64 N. Y. 637. See House Doc. No. 1590, 63d Congress, 3d Sess. [Reeves Report, 1914] and 1929 letters of Secretary Wilbur to Congressional Indian Committees.)

Generally speaking, the State's policies in the public interest have been accepted, except where restricted by Federal legislation or constitutional or treaty limitation, and generally, the validity of such State laws have been recognized where they are consistent with, and supplemental to, the tribal law. (*Rice* v. *Maybee*, 2 F. Supp. 669.) The United States, as guardian and trustee of the Indians, has the right and duty to institute actions to preserve and protect their interests. (*United States* v. *Forness*, 37 F. Supp. 337, *supra; City of Salamanca* v. *United States, supra.*) Thus, it may sue to prevent a State from overriding the tribal customs and usage respecting descent of realty and substituting therefor the State law with respect thereto. (*United States* v. *Charles*, 23 F. Supp. 346.) The United States does not lose such right because the Indians have become citizens, or subject to the laws of a State, or because the Indian himself could bring the action. It has paramount authority over

them (*United States* v. *National Gypsum Co.,* 49 F. Supp. 206, revd. on other grounds, 141 F. 2d 859) and it matters not that the courts of this State are competent to pass upon the particular question involved. It is the duty of the Federal courts to take jurisdiction where such jurisdiction exists. (*Kline* v. *Burke Construction Co.,* 260 U. S. 226, 231; *Farrell* v. *Stoddard,* 1 F. 2d 802, 805.) A New York Indian may sue in the Federal court. (*Deere* v. *State of New York,* 22 F. 2d 851, 854 [1927].) And section 2 of article III of the Constitution of the United States vests original jurisdiction in the Supreme Court " In all Cases * * * in which a State shall be Party * * *." (*Bank of the United States* v. *Planters' Bank,* 9 Wheat. [U. S.] 904.) The court stated in the *Deere* case (p. 854) : " Though the state courts would be competent to pass on the federal question involved here, as they were in Seneca Nation v. Christie, 126 N. Y. 122, * * * it is clear that the state courts will not take jurisdiction in the absence of an enabling act, unless they find the incapacity to sue to have been eliminated by the act of 1924 conferring citizenship on the Indians, which is uncertain. Johnson v. Long Island R. R. Co., 162 N. Y. 462".

The Citizenship Act of 1924, and the Nationality Act of 1940, conferring citizenship on Indians, have been held not unconstitutional as to the Six Nations, notwithstanding that the relation of these tribes to the United States may have been that of an independent nation by virtue of treaties between the signatories and that the above acts may have been at variance with the treaty status of the Six Nations. (*Ex parte Green,* 123 F. 2d 862, certiorari denied, *Green* v. *McLaren,* 316 U. S. 668.) In the above case the court followed the general proposition that a domestic law conflicting with an earlier treaty must be honored by domestic courts.

It may be, the court's conclusion in the above case has not finally answered the problem. The basis of citizenship in the United States is the English doctrine under which nationality meant birth within allegiance of the king. Congress may declare what persons are citizens within the provisions of the 14th Amendment to the Constitution. Such amendment makes such citizens also citizens of the State in which they reside, but the 14th Amendment includes the qualification " subject to the jurisdiction thereof ". Prior to the enactment of the above two statutes, the derivative statutes and court decisions recognized that unsubjugated tribal Indians who retained their tribal identity were not born subject to the jurisdiction of the United

States. (Act of Feb. 8, 1887, 24 U. S. Stat. 390, as amd. Mar. 3, 1901, 31 U. S. Stat. 1447, May 8, 1906, 34 U. S. Stat. 182.)

In any event, the Nationality Act of 1940, provides that the granting of citizenship " shall not in any manner impair or otherwise affect the right of such person to tribal or other property."

Much has been suggested by legislative committees and others toward abrogation of the Onondaga Indians' government by chiefs as being anomalous under existing conditions. Citizenship has been imposed. Except for land interests aforesaid, the obligations of such imposition have been exacted. Their death feast has been termed a relic of their savage past. Their tribunal of chiefs has been castigated as inefficient and corrupt. Division of communal lands has been demanded in. severalty. The Onondagas have not acquiesced. With little left, perhaps, to recall their days of past glory, they stubbornly resist abridgment of their treaty rights and reassert the old Iroquois maxim " The lands belong to the warriors because they form the strength of the nation, and to the women as the mothers of the warriors." They still receive an annuity from the Federal Government under the treaty of 1794, paid in money and cloth, also an annuity of about $1,600 from the State, and salt, pursuant to the treaty of 1788, and subsequent treaties. But they do not look upon these as gifts from the State, as some believe, but rather interest on what we still owe for purchased lands. The power to install and depose chiefs of other tribes rests with them as head of the Six Nations. Their chiefs sit in council as a court where grievances are still presented and decided. This tribunal has original and general jurisdiction over local affairs of reservation members and its decisions are final, save such appeal as may be made to the general council and to the Federal Government. Land disputes are settled by the chiefs as is the question of heirship and devolution of property under the death feast.

The Legislature, in 1888 appointed a special committee (Whipple) to investigate the New York Indian problem. This committee reported back the following year. Their report was before the statutory revision committee when it undertook to revise the Indian Law in 1891, enacted in 1892. It would seem the Legislature had by its act given an Indian his choice to stay on the reservation and live with his tribe under tribal law and be exempt from suit and free from taxation, and having this exemption extend to his guests, or to separate himself from his

tribe, buy lands and pay taxes, engage in business, make contracts and incur legal liability under them. (*Plummer* v. *Hubbard,* 207 App. Div. 29.)

The lands involved in the instant case are communal lands and are not lands allotted to, possessed, or occupied by the claimant. They were acquired by agreement, not by appropriation. It has been held that in determining who are the communal owners entitled to share in the distribution of a fund under a treaty the court will follow Indian laws and customs so far as they do not conflict with the laws of the United States, or the purposes of the treaty, or natural law and justice. (*New York Indians* v. *United States,* 40 Ct. Cl. 448.) The claimant had no title or enforcible right to the communal property, nor did she have a vendible interest in same. (*Franklin* v. *Lynch,* 233 U. S. 269.) She alleges she is an enrolled member of the Onondaga Nation, although residing elsewhere. She does not state what roll, nor whether she is a full-blooded Onondaga Indian; whether she was born on the Onondaga Reservation, whether she has ever lived there, or whether she, at any time, participated as an active member of the tribe. She demands a judgment against the State of New York, as a third party, upon the theory that the State took land in which she had an interest and paid the Council of Chiefs for same without insuring her participation in the distribution. She alleges the State should have known that such would be the result of its method of payment and that by reason of an existing fiduciary relationship of State guardianship over its Indian wards, the State is liable. She does not claim fraud, but bases her legal conclusion primarily upon the case of the *Seminole Nation* v. *United States* (316 U. S. 286). In that case, trust funds were illegally disbursed by the Government. A treaty had been entered into between the Seminole Indians and the United States Government. Such treaty provided for the payment of annuities per capita to the individual members of the tribe. This was not done. The recognized beneficiaries under the treaty sued the Government on the theory that it knew the money would be squandered and that it was responsible, as trustee, for the individual members. The Supreme Court held it would be possible, if the facts were as alleged, to hold the Government responsible on the theory that it had breached a fiduciary duty. It would seem that fraud and knowledge of fraud was inherent in the above case. There is no such fraud here. It would also seem the court based the fiduciary obligation upon the fact that the Government had

directly recognized in the treaty an obligation running from it to the individual third parties.

One of the difficulties with the instant case is that claimant has sought to disregard completely the organization of which she claims to be a member. She has provided the court with no statute which recognizes an obligation running from the State to any and every individual Indian belonging to the Indian Nation, nor has the claimant pointed to any treaty or any agreement where such an obligation was recognized or mentioned. These moneys were not annuities. Annuities have a well-defined meaning relating to a yearly or periodic payment of a certain sum of money (Ballantine, Law Dictionary [1930]). In Cohen, Handbook of Federal Indian Law, annuities have been defined with regard to Indian affairs as follows: " Periodic payments of either money or goods are called ' annuities '. According to the terms of the instrument, an annuity may be a specific amount for a specified number of years, or it may be a specified amount for life or while the Indians are at peace." (p. 199.)

There was no provision in the instant case for any periodic payments. On the contrary, the total amount was to be paid at once to the tribe. It was paid to the Council of Chiefs according to agreement and no complaint is made but what they disbursed it equitably to all the members of the tribe residing on the reservation. The claimed duty on the part of the State to act as trustee would inevitably involve the power to act as such. Upon the facts in this case, approval of such power by judicial determination would appear to usurp fundamental legislative prerogatives.

Property rights of the Onondaga tribe and legal and political relations affecting it would seem to be involved in this proceeding. The nation is not a party. The ultimate result sought is a judgment against the State of New York. Would such a judgment affect the above property rights and relations of the tribe? We think so. An action to recover real property of Indians and one to recover personal property are alike in principal. (*Onondaga Nation* v. *Thacher*, 53 App. Div. 561, affd. 169 N. Y. 584, affd. 189 U. S. 306.) A judgment for claimant in this case would affect the future procedure in the sale of communal property and distribution of the avails. It would embarrass the nation by embarrassing the chiefs who are its government. It would deny the inherent sovereignty of the tribe and involve political considerations without a sufficient showing that the council has failed to follow any applicable law

or custom. Our Court of Appeals has held otherwise. (*Matter of Patterson* v. *Seneca Nation*, 245 N. Y. 433, *supra.*) The same court has recently denied a declaratory judgment where the Seneca Nation was not made a party. (*Wood* v. *City of Salamanca*, 289 N. Y. 279.)

It would serve no useful purpose to further discuss the various matters suggested in the briefs, assigning additional reasons for refusing jurisdiction herein. Our conclusion is that, under the facts in this case, in the absence of legislative action bestowing upon individual Indians the right to litigate internal questions relating to their tribal property in the Court of Claims, and conferring jurisdiction to determine such controversies, this court should not assume jurisdiction.

An order of dismissal may be submitted accordingly.