### The CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,

### and

### The Seneca–Cayuga Tribe of Oklahoma, Plaintiff–Intervenor,

### v.

### Mario M. CUOMO, et al., Defendants.

### Nos. 80–CV–930, 80–CV–960.

United States District Court, N.D. New York.

March 6, 1991.

O'Connor Cavanagh Anderson Westover Killingsworth & Beshears (Glenn M. Feldman, of counsel), Phoenix, Ariz., Joseph Gajarsa McDermott & Reiner (Arthur J. Gajarsa, of counsel), Washington, D.C., for plaintiffs and plaintiff-intervenor.

Robert Abrams, Atty. Gen. of the State of N.Y. (David B. Roberts, Asst. Atty. Gen., of counsel), Albany, N.Y., for State defendants.

Huber Lawrence & Abell (Howard M. Schmertz, of counsel), New York City, for New York State Elec. & Gas Corp.

Hiscock & Barclay (Richard K. Hughes, of counsel), Syracuse, N.Y., for Consolidated Rail.

Goodwin Procter & Hoar (Allan van Gestel, of counsel), Boston, Mass., for Counties of Cayuga, Seneca & Miller Brewing.

Wiles Fahey & Lynch (Joseph E. Fahey, of counsel), Syracuse, N.Y.

### MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

The plaintiffs and the defendants have moved for summary judgment concerning the issue of whether defendants' legal defense of abandonment effectively precludes the plaintiffs from maintaining the instant action. The plaintiffs contend that abandonment is not a viable defense to this lawsuit, and that they can succeed in the present action even though they no longer live on the land at issue in this dispute. The defendants argue that the plaintiffs cannot prevail in this action because they allegedly abandoned the land which is the subject of plaintiffs' claims. For the reasons stated below, this court grants the plaintiffs' motion for partial summary judgment and denies the defendants' motion.

### *Background*

This is the fourth memorandum-decision and order issued by this court concerning the present action, and familiarity with the background of this case is presumed. *See Cayuga Indian Nation of New York et al. v. Cuomo et al.*, 565 F.Supp. 1297 (N.D.N.Y.1983) (*"Cayuga I"*); *Cayuga Indian Nation of New York et al. v. Cuomo et al.*, 667 F.Supp. 938 (N.D.N.Y.1987) (*"Cayuga II"*) and *Cayuga Indian Nation of New York et al. v. Cuomo et al.*, 730 F.Supp. 485 (N.D.N.Y.1990) (*"Cayuga III"*). However, a brief review of the facts concerning plaintiffs' claims is in order.

Plaintiff Cayuga Indian Nation of New York and plaintiff-intervenor Seneca–Cayuga Tribe of Oklahoma (collectively referred to as "the plaintiffs" or "the Cayugas") both seek a declaration from this court concerning their current ownership of and right to possess a tract of land in central New York State containing approximately 64,000 acres ("the subject land"), an award of fair rental value for the almost two hundred years during which they have been out of possession of the subject land, and other monetary and protective relief.[1]

This court has previously held that the plaintiffs can present evidence in support of the above claims. *Cayuga I*, 565 F.Supp. at 1330. In *Cayuga II*, this court denied both parties' motions for summary judgment on plaintiffs' claims. *Id.*, 667 F.Supp. at 949. In *Cayuga III*, this court granted the plaintiffs' motion for partial summary judgment and held that agreements entered into in the years 1795 and 1807 between the plaintiffs and New York State, wherein the plaintiffs purportedly conveyed to the State of New York the plaintiffs' interest in the subject land, were invalid. *Id.*, 730 F.Supp. at 493.

By the instant motion, the plaintiffs seek an order from this court holding that the defendants' affirmative defense alleging abandonment is insufficient as a matter of law to preclude recovery on plaintiffs' claims. The defendants contend that this defense bars the plaintiffs from succeeding on their claims against defendants, and have therefore moved for summary judgment on plaintiffs' complaint.

---

1. Plaintiffs maintain that their members are the direct successors in interest to the Cayuga Nation of the Six Nation Iroquois Confederacy which, until the acts complained of in this suit, occupied the land at issue since time immemori-
al. *Cayuga I*, 565 F.Supp. at 1302. The Six Nations in this Confederacy were comprised of the Oneida, Tuscarora, Mohawk, Onondaga, Cayuga and Seneca Nations. *Id.* at 1303.

## Discussion

### (1) The Cayugas' title concerning the subject land.

The first aspect of these motions which this court must consider in arriving at its decision relates to the form or type of title held by the plaintiffs regarding the subject land.

 There are two distinct types of title to Indian land; "aboriginal" title and "recognized" or "reserved" title. An Indian tribe obtains aboriginal title in land when it continually uses and occupies said property to the exclusion of other Indian tribes or persons. Conversely, where Congress has, by treaty or statute, conferred upon an Indian tribe, or acknowledged to the Indians, the right to permanently occupy and use certain land, an Indian tribe is said to possess recognized or reserved title in such land. *Bennett County v. United States,* 394 F.2d 8, 11 (8th Cir.1968); *Miami Tribe of Oklahoma v. United States,* 175 F.Supp. 926, 936, 146 Ct.Cl. 421 (1959).

 Differentiating between these two forms of title is critical in resolving the issues before this court. Since aboriginal title is dependent upon actual, continuous and exclusive possession of the land, proof of a tribe's voluntary abandonment of such property constitutes a defense to a subsequent claim concerning the land. *See e.g.* F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) at 492 and cases cited therein.[2] However, if an Indian tribe possesses recognized title in certain land, then Congress, and only Congress, may divest the tribe of its title to such land. *Cf. Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984), *reh'g denied* 466 U.S. 948, 104 S.Ct. 2148, 80 L.Ed.2d 535 (1984) ("only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire plot retains its reservation status until Congress explicitly indicates otherwise") (*citing United States v.*

*Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94–95, 54 L.Ed.2d 195 (1909)); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 587–88, 97 S.Ct. 1361, 1363–64, 51 L.Ed.2d 660 (1977); *De Coteau v. District County Ct. for Tenth Jud. Dist.,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975), *reh'g denied* 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975); *Mattz v. Arnett,* 412 U.S. 481, 504–05, 93 S.Ct. 2245, 2257–58, 37 L.Ed.2d 92 (1973); *see also* F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) at 493.

 Central to the plaintiffs' argument that the defense of abandonment is insufficient as a matter of law with respect to their claims is their contention that the 1794 Treaty of Canandaigua ("the Treaty"), entered into between the federal government and the Six Nations, afforded the plaintiffs recognized title to the subject land.

This Treaty contained, *inter alia,* the following provisions:

### Article I

Peace and friendship are hereby firmly established, and shall be perpetual, between the United States and the Six Nations.

### Article II

The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.

---

**2.** In fact, the plaintiffs concede that "[b]ecause aboriginal title is based upon continued use and occupancy of the land, aboriginal title can be voluntarily abandoned." *See* plaintiffs' memorandum in opposition to defendants' motion for summary judgment, p. 9.

### Article III

The land of the Seneka nation is bounded as follows: [Article III continues by describing in detail the boundaries of the Seneka nation's land, and concludes by stating:] Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the Seneka nation; and the United States will never claim the same, nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.

### Article IV

The United States having thus described and acknowledged what lands belong to the Oneidas, Onondagas, Cayugas and Senekas, and engaged never to claim the same, nor disturb them, or any of the Six Nations, or their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: Now, the Six Nations, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States; nor ever disturb the people of the United States in the free use and enjoyment thereof.

\* \* \* \* \* \*

In witness whereof, [Federal Treaty Commissioner] Timothy Pickering, and the sachems and war chiefs of the Six Nations, have hereto set their hands and seals.

Done at Konondaigua, in the State of New York, the eleventh day of November, in the year one thousand seven hundred and ninety-four.

Following this provision, the signatures of approximately 60 individuals and 12 witnesses appear. *See* 7 Stat. 44.

■■■ The interpretation of the language contained in this, or any treaty, is a question of law for a court to decide. *See Sioux Tribe v. United States*, 500 F.2d 458, 462, 205 Ct.Cl. 148 (1974) ("[w]e have repeatedly held that the interpretation of an Indian treaty is a question of law, not a matter of fact") and cases cited therein; *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n. 2 (9th Cir.1986), *cert. denied* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *Strong v. United States*, 518 F.2d 556, 563, 207 Ct.Cl. 254 (1975), *cert. denied* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). Therefore, this court must examine these provisions of the Treaty and determine whether it conferred recognized title on the plaintiffs.[3]

(a) Did the Treaty confer recognized title to the Cayugas?

When determining whether a treaty or statute confers reserved title to an Indian tribe, courts must keep in mind that "formal statements of recognition are not necessary in order that a Treaty be deemed to have recognized title in a particular Tribe." *United States v. Kiowa, Comanche and Apache Tribes of Indians*, 479 F.2d 1369, 1374, 202 Ct.Cl. 29 (1973), *cert. denied sub nom.* 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). Such title "may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation." *Tee–Hit–Ton Indians v. United States*, 348

---

**3.** In analyzing the provisions of this Treaty, this court is mindful of the general rule courts must follow in interpreting Indian treaties. This axiom provides that "[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973) (*citing Carpenter v. Shaw*, 280 U.S.

363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930)). *See also Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970), *reh'g denied* 398 U.S. 945, 90 S.Ct. 1834, 26 L.Ed.2d 285 (1970) ("treaties with the Indians must be interpreted as they would have understood them, and any doubtful expressions in them should be resolved in the Indians' favor") (citations omitted); F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) at 221–22.

U.S. 272, 278–79, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955).

> As the court of claims noted in *Strong:*
> Where Congress has by treaty or statute conferred upon the Indians or acknowledged in the Indians the right to *permanently* occupy and use land, then the Indians have a right or title to that land.

*Id.,* 518 F.2d at 563 (emphasis in original), *quoting Miami Tribe, supra,* 175 F.Supp. at 936.

The plaintiffs contend that the plain, unambiguous language of the Treaty conferred recognized title upon the Cayugas. They point out that Article II of the Treaty explicitly provides that "[t]he United States *acknowledge the lands reserved to* the . . . *Cayuga Nations,* in their respective treaties with the state of New York, *and called their reservations,* to be their property." This Article concludes by noting that "the *said reservations shall remain theirs,* until they choose to sell the same to the people of the United States, who have the right to purchase."

Article IV notes that, by this Treaty, the United States *"described and acknowledged what lands belong to the . . . Cayugas"* (emphasis supplied throughout).[4]

Despite the plain language contained in these two Articles, the defendants contend that this Treaty "simply acknowledged whatever aboriginal right of occupancy the Cayuga tribe may have had."[5] In support of this contention, the defendants rely primarily on *Andrews v. State of New York,* 192 Misc. 429, 79 N.Y.S.2d 479 (Ct.Cl.1948), *aff'd* 276 A.D. 814, 93 N.Y.S.2d 705 (1949); *Seneca Nation of Indians v. United States,* 173 Ct.Cl. 917 (1965); *People ex rel. Ray v. Martin,* 294 N.Y. 61, 60 N.E.2d 541 (Ct.App.1945) and *Williams v. Chicago,* 242 U.S. 434, 37 S.Ct. 142, 61 L.Ed. 414 (1917). However, defendants' reliance on these cases is misplaced.

In *Andrews,* New York's court of claims was confronted with a claim by an enrolled member of the Onondaga Indian Nation who, although she did not live on the reservation, argued that the State of New York had abridged certain rights she possessed in communal lands of said Nation. In commenting on the primary defect in the claimant's case, the court noted that Ms. Andrews:

> [S]ought to disregard completely the organization of which she claims to be a member. She has provided the Court with no statute which recognizes an obligation running from the State to any and every individual Indian belonging to the Indian Nation, nor has the claimant pointed to any treaty or any agreement where such an obligation was recognized or mentioned.

*Id.,* 79 N.Y.S.2d at 488. In light of these facts, the court dismissed plaintiff's claim, concluding that:

> [I]n the absence of legislative action bestowing upon individual Indians the right to litigate internal questions relating to their tribal property in the Court of Claims, and conferring jurisdiction to determine such controversies, this Court should not assume jurisdiction.

*Id.* 79 N.Y.S.2d at 489.

However, prior to finding that it had no jurisdiction over plaintiff's claim, the court stated, in what was necessarily dicta, that the 1794 Treaty of Canandaigua "did not create the Onondaga Reservation, but confirmed the Onondaga's aboriginal right of possession." *Id.* 79 N.Y.S.2d at 482.

The defendants claim that this statement in *Andrews* necessarily precludes the plaintiffs from succeeding in the present action. Since the *Andrews* court found that the Treaty merely "confirmed the Onondaga's aboriginal right of possession" to the land, the defendants allege that the Cayugas, whose claim to recognized title is based on

---

**4.** *See* 7 Stat. 44. The treaty referred to in Article II concerning the State of New York was the 1789 treaty entered into between the plaintiffs and the State. By this treaty, the Cayugas relinquished approximately 3,000,000 acres in what is now central New York State to the State, reserving for their own use the 64,015 acres that

is the subject of the present dispute. *Cayuga I,* 565 F.Supp. at 1303–04.

**5.** Defendants' memorandum in opposition to plaintiffs' motion for partial summary judgment ("Def.Resp.Memo."), p. 3.

the same Article of the Treaty discussed in *Andrews*, likewise only have an aboriginal right of possession in the subject land.

This is not the case.

■ The court's reference to the rights allegedly created by the Treaty in *Andrews* was mere dicta, since that court dismissed plaintiff's claim for lack of jurisdiction. A court is free to disregard a prior court's obiter dicta concerning an issue which is squarely in dispute in a subsequent action. *See, e.g., United States v. Crawley*, 837 F.2d 291, 292 (7th Cir.1988). An important factor weighing against a court's relying on dicta in reaching its own determination concerning such an issue is the fact that the prior court may not have considered the issue as fully as it would have had the issue been essential to the outcome of the prior case. *Id.* In matters involving treaties, the *Andrews* court itself recognized that a federal court's interpretation of a treaty is binding on state courts. *See id.*, 79 N.Y.S.2d at 484. This court believes that the *Andrews* court did not fully consider all of the relevant issues regarding the type of title conferred to the Indian tribes by the Treaty in its comments concerning the same, since that issue was neither essential nor relevant to the court's ultimate holding in that case. Therefore, this court is not constrained, nor is it persuaded by that court's interpretation of the Treaty of Canandaigua.

In *Seneca Nation of Indians, supra*, the U.S. Court of Claims stated that:

[T]he purpose of [the Treaty] was to reconfirm peace and friendship between the United States and the Six Nations, to correct an inadvertent error in the boundaries theretofore allotted to the Indians, and to relinquish any rights the United States may have acquired through this error. There was no purpose to divest New York and Massachusetts of their rights, nor was there any purpose to prevent or supervise sales or transfers of Seneca territory.

*Id.*, 173 Ct.Cl. at 922 n. 5.

However, the crux of the claims in *Seneca Nation of Indians* concerned disputes between the parties over the proper role of the federal government with respect to Indian tribes in light of the newly established fiduciary relationship between the Indians and the federal government created by the passage of the 1790 Trade and Intercourse Act. Prior to the Act's passage, the prevailing standard which courts had utilized in reviewing conveyances of Indian land for possible fraud or deceit had been the "just and honorable dealings" standard provided by the Indian Claims Commission Act. Subsequent to the Act's passage, however, the Court of Claims held that Indians were also protected against improvident, unfair or unconscionable conveyances of their land, *id.* at 925, and that therefore conveyances of Indian land subsequent to the passage of the Act had to be scrutinized in light of this heightened standard. *Id.* at 927.

Since that court's interpretation of the language of the Treaty concerning the Seneca Nation's lands was not necessary for its ultimate holding, its comments were dicta and therefore not binding on this court. Moreover, that case was concerned with the language contained in Article III of the Treaty, which dealt exclusively with the boundaries of the Seneca Nation's land and the rights afforded to the Seneca Nation regarding this land. There are significant differences between that Article and Article II of the Treaty, which dealt with the Cayugas.

Article II acknowledges the lands "reserved to" the Cayuga Nation and "called their reservations." It continues by stating that these "reservations" shall remain theirs until they choose to sell the same to the people of the United States. Article III never acknowledges lands "reserved" to the Senecas, nor does it refer to the land of the Seneca Nation as a "reservation". As the plaintiffs point out, had the United States intended to deal with the Cayuga reservation and the Seneca lands in an identical manner, it would have used identical language and terminology when referring to these tribes in the Treaty. Its use of the words "reserved" and "reservation" with respect to the Cayuga reservation, and the complete absence of these words in

the Treaty's provisions concerning the Seneca lands, clearly indicates to this court that the United States dealt with these two tribes differently when it treated with them at Canandaigua.

In *Martin, supra,* a prisoner was challenging the validity of his conviction for murder and the life sentence imposed on him because of his crime. Ray alleged that the Supreme Court of the State of New York was without jurisdiction to hear the People's case against him because his offense was committed on an Indian reservation. After discussing at some length the federal and New York State governments' respective involvement with Indian tribes, the Court affirmed the conviction and sentencing of Ray. Before reaching this conclusion, the Court stated that the Treaty of Canandaigua "did not create any reservation but confirmed the Senecas' aboriginal right of possession." *Id.,* 294 N.Y. at 68, 60 N.E.2d at 544. The Court subsequently noted that "the doubts and vagueness that becloud the general subject of law on Indian reservations, have nothing whatsoever to do with criminal prosecutions like that of this relator for the killing of Paul Balsiger...." *Id.* at 73, 60 N.E.2d at 547.

As with the *Andrews* and *Seneca Nation of Indians* cases, the Court's statement in *Martin* regarding the rights created by the Treaty was not necessary for its ultimate finding, and was therefore dicta.[6] Additionally, *Martin* involved a jurisdictional dispute regarding a crime which occurred on the grounds of the Seneca Nation. As discussed *supra,* the Treaty of Canandaigua refers to and treats the Seneca lands in a manner different than that of the Cayuga reservation. While the Treaty may not have conferred recognized title on the Seneca Indians, such a finding would not be dispositive of the issue of whether the

Treaty created recognized title for the plaintiffs herein.

Since the Court's comments in *Martin* regarding the rights conferred to the Seneca Nation by the Treaty were both dicta and based upon Article III, and not Article II, of the Treaty, this court finds *Martin* distinguishable from the present case.

Finally, in *Williams, supra,* several members of the Pokagon Band of Pottawatomie Indians commenced an action against the city of Chicago and numerous corporations occupying lands in Illinois. The complaint alleged that they and the other members of the Pottawatomie Nation of Indians were owners of certain lands in Illinois being occupied by the defendants. The plaintiffs alleged that the Treaty of Greenville, 7 Stat. 49, had conferred what is now called recognized title to the Pottawatomie Nation, and accordingly sought an injunction ordering the defendants out of the lands, as well as reasonable compensation for their use of the property at issue.

In affirming the dismissal of plaintiffs' claims, the Supreme Court noted that the Treaty of Greenville:

> [D]id not convey a fee-simple title to the Indians; that under it no tribe could claim more than the right of continued occupancy; and that when it was abandoned, all legal right or interest which both tribe and its members had in the territory came to an end.

*Id.,* 242 U.S. at 437–38, 37 S.Ct. at 144.

The defendants contend that "the facts before the Supreme Court in *Williams* are strikingly similar to those before this Court" in that:

> In each treaty, the federal government acknowledged that the signatory tribes had a continued right to use and occupy certain land; neither treaty conveyed fee-simple title to the signatory tribes.[7]

---

**6.** In fact, neither Ray nor his victim were members of the Seneca Nation.

**7.** Defendants' Reply Memorandum, p. 4. The court notes that in his sixth affidavit submitted to this court, Dr. Francis G. Hutchins states that in both the Treaty of Greenville and the Treaty of Canandaigua "the federal government acknowledged that the signatory tribes had a continued right to use and occupy certain land",

and that neither of these treaties "conveyed fee-simple title to the signatory tribes." Sixth affidavit of Dr. Francis G. Hutchins, 11/14/90 ("6th Hutchins Aff."), ¶ 6(r). However, this legal argument is not only improper under Rule 10(c) of the local rules for the Northern District of New York, but it is also irrelevant in this court's analysis of the Treaty. As stated *supra,* the interpretation of language contained in a

However, *Williams* is readily distinguishable from the present case.

Initially, it must be reiterated that the *Williams* Court was interpreting the Treaty of Greenville, and not the Treaty of Canandaigua, when it determined that the Pottawatomie Nation of Indians did not possess fee simple title concerning the land at issue in that case. The Treaty of Greenville, unlike the Treaty of Canandaigua, does not acknowledge lands "reserved" to the tribe, nor does it refer to the land as a "reservation". Rather, the Treaty of Greenville provides that the United States relinquished its claims to certain lands referred to in that treaty—there is no acknowledgement of any reservation in that treaty, as there is in the Treaty of Canandaigua. Additionally, subsequent to the *Williams* decision, numerous courts, including the United States Supreme Court, have developed and clarified the distinction between aboriginal and reserved title. *See e.g., Tee–Hit–Ton Indians, supra,* 348 U.S. at 277–85, 75 S.Ct. at 316–20; *United States v. Sioux Nation of Indians,* 448 U.S. 371, 415 n. 29, 100 S.Ct. 2716, 2740 n. 29, 65 L.Ed.2d 844 (1980); *Lac Courte Oreilles Band etc. v. Voigt,* 700 F.2d 341, 351–52 (7th Cir.1983), *cert. denied & app'l dismissed sub nom.,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983); *Strong, supra,* 518 F.2d at 563; *Miami Tribe, supra,* 175 F.Supp. at 936–37 (interpreting the Treaty of Greenville to confer recognized title on the Miami Tribe of Oklahoma to certain lands described therein).

This court's holding does not stand for the proposition that *whenever* a treaty describes and refers to land claimed by an Indian tribe that such Indian tribe necessarily obtains recognized title in such land. Rather, this court has interpreted the language contained in the Treaty of Canandaigua which refers specifically to the plaintiffs. In this court's opinion, the Treaty's plain language confers reserved title to the Cayugas. The Treaty acknowledges lands "reserved" to the Cayugas, and re-

fers to such land as their "reservation". Since the plaintiffs possess treaty-recognized title in the subject land, only Congress may divest the tribe of its title to this land. The fact that the Cayugas may no longer reside on the subject land is simply not a legally sufficient defense to the plaintiffs' claims, which are based upon federally recognized title. *Cf. Solem, supra,* 465 U.S. at 470, 104 S.Ct. at 1166; *Rosebud Sioux Tribe, supra,* 430 U.S. at 587–88, 97 S.Ct. at 1363–64; *De Coteau, supra,* 420 U.S. at 444, 95 S.Ct. at 1092–93; *Mattz, supra,* 412 U.S. at 504–05, 93 S.Ct. at 2257–58. *See also* F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) at 493.

(b) New York's interest concerning the subject land.

■ The defendants claim that the Treaty could not have conveyed recognized title to the plaintiffs because such conduct would have purportedly divested New York State of its alleged fee title interest in the land without affording the defendants the due process and just compensation required by the Fifth Amendment of the United States Constitution. They allege that Federal Treaty Commissioner Timothy Pickering believed that New York State owned fee title to the subject land, and that the only means by which title to the land could be altered would be with the consent of the New York State legislature. They further contend that neither the United States Senate nor the State of New York believed that the Treaty of Canandaigua conferred any rights upon the Cayuga Indian Nation other than those rights the plaintiffs already possessed. Finally, they argue that had the State of New York understood the Treaty of Canandaigua to be interfering with New York's alleged property rights in the subject land, the State would have objected to this Treaty, as it had concerning the 1784 Confederal Treaty of Fort Stanwix and the 1789 Confederal Treaty of Fort Harmar.[8]

treaty is not a matter of fact, but rather a question of law for a court to decide. *See Sioux Tribe, supra,* 500 F.2d at 462; *Ringrose, supra,*

788 F.2d at 643 n. 2; and *Strong, supra,* 518 F.2d at 563.

8. *See generally* Def.Resp.Memo., pp. 4–10.

It is well settled that a State's affairs with an Indian tribe are subject to the paramount authority of the federal government governing such matters. *Tuscarora Nation of Indians v. Power Authority of New York*, 257 F.2d 885, 891 (2d Cir.1958); *cert. denied* 358 U.S. 841, 79 S.Ct. 66, 3 L.Ed.2d 76 (1958) ("[n]ot only has Congress not abandoned the field with respect to the property interests of Indian tribes in the State of New York, but it has ... pointed up and reaffirmed its paramount authority over Indian tribal lands); *Mulkins v. Snow et al.*, 232 N.Y. 47, 51, 133 N.E. 123 (Ct. App.1921) (Pound, J.) ("[w]hen the state of New York legislates in relation to [Indian] affairs, its action is subject to the paramount authority of the federal government").

Contrary to the defendants' assertions, the State of New York did not possess a property interest in the subject land. Their interest in this land was, at most, a right of preemption—the right to purchase the property if and when the plaintiffs' title to the land was extinguished. Such a right of preemption is not a property right, but rather a mere expectancy concerning the property, with no right vesting in such person until Congress acts to extinguish the Indian interest in the land. *See e.g.*, F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) at 514 and cases cited therein. Once New York State ratified the United States Constitution, relations with Indian tribes and authority over Indian lands fell under the exclusive province of federal law. *County of Oneida v. Oneida Indian Nation of New York*, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985), *reh'g denied* 471 U.S. 1062, 105 S.Ct. 2173, 85 L.Ed.2d 491 (1985). Thus, the conditions under which New York's right of preemption to the subject property could be exercised by the State are governed solely by federal law. *Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661, 670, 94 S.Ct. 772, 779, 39 L.Ed.2d 73 (1974). The Treaty of Canandaigua was simply an assertion by the federal government of its superior authority over matters involving Indian affairs granted to the federal government by the Constitution; it did not divest the State of New York of any property right concerning the subject land.

Defendants' contention that the Treaty cannot be interpreted as conferring reserved title to the Cayugas because of the State's apparent acquiescence concerning the ratification of the Treaty is also without merit. As this court has noted, by its ratification of the Treaty the federal government did not divest the State of New York of any property interest in the subject land. Moreover, as the plaintiffs point out, any actions taken by the State relating to the Treaties of Fort Stanwix and Harmar—treaties which were entered into while this Nation was operating under the Articles of Confederation—are irrelevant in interpreting the rights conferred by the 1794 Treaty of Canandaigua. While the State retained certain rights with respect to Indian lands within its borders under the Articles of Confederation, such rights were ceded by the State to the federal government by the State's ratification of the Constitution. Any preemptive rights the State had concerning the purchase of the subject land were necessarily subject to the federal government's power regarding the extinguishment of the Cayugas' title to this land; *see e.g., Cayuga I*, 565 F.Supp. at 1312 n. 10; for only Congress may divest an Indian tribe of its recognized title to Indian land. *Cf. Solem, supra*, 465 U.S. at 470, 104 S.Ct. at 1166; *Rosebud Sioux Tribe, supra*, 430 U.S. at 587–88, 97 S.Ct. at 1363–64; *De Coteau, supra*, 420 U.S. at 444, 95 S.Ct. at 1092–93; *Mattz, supra*, 412 U.S. at 504–05, 93 S.Ct. at 2257–58. The State of New York's actions—or inactions—regarding the ratification of the Treaty of Canandaigua did not somehow exempt the State from the normal operation of federal law concerning the diminishment of an Indian reservation.

Simply put, the plain language of the Treaty of Canandaigua indicates to this court that this Treaty conferred recognized title to the Cayugas concerning the subject property. The State of New York did not have a compensable property interest in this land at the time this Treaty was ratified. New York's failure to object to the

federal government's ratification of the Treaty of Canandaigua is not a ground for this court to conclude that this Treaty did not confer recognized title to the plaintiffs concerning the subject land. Accordingly, the plaintiffs' motion for partial summary judgment must be granted, as the affirmative defense of abandonment is legally insufficient to defeat the plaintiffs' claim to the subject land.

### (2) Plaintiffs' physical abandonment of the land.

The defendants contend that proof of the plaintiffs' physical abandonment of this land precludes the Cayugas from prevailing on the claims asserted in the present action.[9]

Relying on several affidavits of Dr. Francis G. Hutchins and numerous exhibits submitted therewith, the defendants contend that there is no evidence that the Cayuga tribe ever occupied the subject land after 1794.[10] They claim that in that year, the Cayugas, led by an Indian named Fish Carrier, (whom the defendants allege was the Cayugas' "supreme leader" from 1775 to 1796) left Buffalo Creek and relocated to Grand River in Canada.[11] They further allege that the Indians who remained in the subject lands after 1794 were not members of the Cayuga tribe.[12]

The plaintiffs dispute these contentions. They claim that Fish Carrier was never a League Chief of the Cayugas, and that there was no one supreme leader of the Cayugas.[13] The plaintiffs also disagree with the defendants' assertions concerning the time of the exodus of the Cayugas from the subject land to Grand River. While they concede that some members of the tribe lived at Buffalo Creek from 1780 to 1794,[14] they claim that:

> [T]he historical record is clear that other members of the Cayuga Nation, under the leadership of other Cayuga chiefs, continued to live on and occupy the Reservation at Cayuga Lake well after the treaties with the State of New York in 1789 and 1795 and probably into the early years of the nineteenth century.[15]

The plaintiffs proffered several exhibits to the court which supported their position that some members of the Cayuga tribe resided on the subject land some time after 1794.

It is clear that there are questions of fact concerning whether Fish Carrier was a supreme leader of the Cayugas who led all members of the Cayuga tribe out of the subject land in 1794. Both parties have proffered evidence to this court which supports their respective positions. However, even if the defendants are correct in their assertions concerning the Cayugas' physical abandonment of the land at issue, the plaintiffs are nevertheless entitled to partial summary judgment. As stated earlier by this court, proof of a tribe's physical abandonment of land is only a defense to a claim which is based upon aboriginal title to such land. This court has found that the plaintiffs obtained recognized title to the subject land by the Treaty of Canandaigua, and therefore only Congress can divest the plaintiffs of their title to this land. Thus, evidence of the plaintiffs' physical abandonment of the subject land is both irrelevant and immaterial to the present action, which is based upon reserved title to such land.

---

**9.** It appears as though this argument in support of their motion for summary judgment is based on the defendants' erroneous assumption that the plaintiffs only possessed aboriginal title to the subject land. Nevertheless, a brief review of this argument is warranted.

**10.** See e.g., fifth affidavit of Dr. Francis G. Hutchins, 9/28/90, ¶ 5(1); fourth affidavit of Dr. Francis G. Hutchins, 8/29/90 ("4th Hutchins Aff."), ¶ 5(nn).

**11.** 4th Hutchins Aff., ¶ 5(a)–(d); 6th Hutchins Aff., ¶ 6(f)–(h).

**12.** 4th Hutchins Aff., ¶ 5(ii)–(jj).

**13.** Affidavit of Dr. Elizabeth Tooker, 9/26/90, ¶ 6.

**14.** See id. ¶¶ 8–9.

**15.** Id., ¶ 9.

### Conclusion

The 1794 Treaty of Canandaigua conferred recognized title to the Cayugas concerning the land at issue in this proceeding. This Treaty did not deprive the State of New York of any property interest in such land, because the State only possessed, at most, a right of preemption regarding the subject land, i.e., the right to purchase the property if and when the Cayugas' title to the land was extinguished by the federal government. New York's acquiescence concerning federal ratification of the Treaty of Canandaigua did not prevent the plaintiffs from obtaining recognized title to the subject property. Finally, proof of the plaintiffs' physical abandonment of the property at issue is irrelevant in a claim for land based upon reserved title to Indian land, for such title can only be extinguished by an act of Congress.

Accordingly, plaintiffs' motion for partial summary judgment is granted, and defendants' motion for summary judgment is denied.

IT IS SO ORDERED.