The CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,

and

The Seneca–Cayuga Tribe of Oklahoma, Plaintiff–Intervenor,

v.

George E. PATAKI, et al., Defendants.

Nos. 80–CV–930, 80–CV–960.

United States District Court, N.D. New York.

Dec. 23, 1999.

Mariscal Weeks McIntryre, & Friedlander, Phoenix, AZ, Glenn M. Feldman, of counsel, for plaintiff–intervenors.

Rubin Baum Levin Constant & Friedman, New York City, Martin R. Gold, Raymond J. Heslin, of counsel, for plaintiffs Cayuga Indian Nation of New York.

Eliot Spitzer, Attorney General of the State of New York, Albany, NY, David B. Roberts, of counsel, for State defendants.

Huber Lawrence & Abell, New York City, Theodore F. Duver, of counsel, for defendant New York State Electric & Gas Corporation.

Goodwin Procter & Hoar, Boston, MA, Anthony M. Feeherry, of counsel, for Miller Brewing and defendant Class.

Harris Beach & Wilcox, Rochester, NY, William L. Dorr, Brian Laudadio, of counsel, for defendant Counties.

Hank Meshorer, U.S. Department of Justice, Environment & Natural Division, Washington, DC, for United States Special Litigation Section.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

On December 20, 1999, the court heard oral argument with respect to a number of motions *in limine* made by the plaintiffs, the Cayuga Indian Nation of New York ("the Nation") and the Seneca–Cayuga Tribe of Oklahoma ("the Tribe"),[1] the plaintiff-intervenor, the United States of America ("the U.S."), and the State of New York ("the State"), one of the defendants in this action. After slightly more than four hours of oral argument, the court strongly hinted at how it would rule on some but not all of these motions. The court further indicated that a written deci-

sion would be forthcoming shortly addressing all of these motions. Following constitutes the same.

## I. Tribal Plaintiffs

### A. Amendment/Partial Summary Judgment

The court will first address the simplest of the present motions (and hence, the only one to which there is no opposition)—the Tribal plaintiffs' separate motion to amend their respective complaints and for partial summary judgment against the State on the issue of liability. This motion is purely a procedural housekeeping matter. The bottom-line is that neither the Nation nor the Tribe named the State itself as a defendant in their original complaints, although various State agencies, departments and individuals, in their official capacities as State officers, were so named.[2] Among others, however, "Mario M. Cuomo [then governor] **and** the State of New York" did file an answer. Based upon the foregoing, the Tribal plaintiffs are seeking to add the State itself as a defendant pursuant to Fed.R.Civ.P. 15(b), which allows "amendments to conform to the evidence" to be raised "at any time, even after judgment."

Additionally, the Tribal plaintiffs are seeking partial summary judgment because in 1991, when the court granted them such relief, it expressly did so "as to all defendants **except** the State of New York[,]" inviting the State to make a motion on Eleventh Amendment grounds. *Cayuga Indian Nation of New York v. Cuomo*, 771 F.Supp. 19, 24 and n. 9 (N.D.N.Y.1991) (*"Cayuga VII"*) (emphasis added). Despite the fact that at last all of the liability issues in this case have been resolved, no liability judgment was ever

---

1. The Nation and the Tribe will be collectively referred to throughout as the "Tribal plaintiffs." References herein to "plaintiffs" shall be read as including the Nation, the Tribe and the U.S.

2. *See Cayuga Indian Nation of New York v. Cuomo,* 1999 WL 509442, at *3–*4 (N.D.N.Y. July 1, 1999) (*"Cayuga X"*); and *Cayuga Indian Nation of New York v. Pataki,* 79 F.Supp.2d 66, 68 n. 2 (1999) (*"Cayuga XI"*).

entered against the State. Therefore, the Tribal plaintiffs are seeking the same in accordance with Fed.R.Civ.P. 56.

The State does not oppose either of these motions. *See* State of New York Defendants' Memorandum of Law in Opposition to Plaintiffs' Motions in Limine ("St.Opp.Memo.") at 44. The State does, however, assert one caveat, which it reiterated during oral argument: It "preserve[s] and incorporate[s] by reference all prior defenses and other arguments raised in opposition to plaintiffs' motions for partial summary judgment including the Eleventh Amendment." *Id.* With that understanding, and because granting these motions will serve the laudable purpose of ensuring that there is no ambiguity here, as least with respect to the status of the State as a defendant and its liability, the court grants the same.

### B. *"Additional Consideration"*

Turning next to the Tribal plaintiffs' motions *in limine*, they strenuously argue that the court should "exclud[e] all evidence and testimony concerning 'additional consideration'" which they may have received from the State.[3] Pl. Notice of *in Limine* Motion at 1. In a similar vein, the Tribal plaintiffs are seeking a "determin[ation] that the State … may *not* be credited with any payment made to the[m] with respect to the land which is the subject of th[is] case and [that the State] be excluded at trial from making any mention of … such payments." *Id.* at 2 (emphasis added). Evidently this dispute over the admissibility of "additional consideration" evidence has arisen primarily because of the Tribal plaintiffs' interpretation of the proposed testimony of John D. Dorchester, Jr., the State's real estate appraisal "expert." As the Tribal plaintiffs' view his testimony and report, Dorchester will end up concluding that they actually *owe* the

State money, anywhere from $65–$95 million to as much as $795 million. *See* Plaintiffs' Joint Memorandum of Law in Support of Motion in Limine ("Pl.Supp. Memo.") at 11–12. The Tribal plaintiffs also find troubling Dorchester's supposed "credit[ing] [of] the State with the yearly annuity payments which the State agreed to pay [them,] *regardless* of whether such sums were actually paid[.]" *Id.* at 11 (emphasis added).

In their notice of motion, the only basis which the Tribal plaintiffs offer for excluding "additional consideration" evidence is the law of the case doctrine. In their memorandum of law, however, and again during oral argument, the Tribal plaintiffs focused more heavily upon the argument that because the 1795 and 1807 transactions were "illegal," and indeed, because the 1793 Nonintercourse Act made it a misdemeanor to negotiate for the purchase of land with Indians without a federal presence, the State should not be allowed to benefit from this asserted "criminal" conduct by seeking a set-off for these additional payments. The court will address these arguments *seriatim.*

#### 1. *Law of the Case*

■ The Tribal plaintiffs argue that the law of the case doctrine bars proof of "additional consideration" paid by the State because "this Court has … ruled, [that] the receipt, amount or sufficiency of additional consideration for conveyances invalid under the Nonintercourse Act is completely immaterial *with respect to the claim for damages for violation of the Act.*" Pl.Supp.Memo. at 9 (emphasis added). The State bluntly responds that this argument has "no basis in fact or in law." St.Opp.Memo. at 38. The court agrees. As will be seen, in making this broad assertion, the Tribal plaintiffs' are taking

---

**3.** Presumably because of the court's prior ruling that it *"will … allow* proof as to whether the Cayugas received sufficient consideration for [the] property[ ]" in 1795, the Tribal plaintiffs have limited this aspect of their motion to

payments made after the 1795 and 1807 transactions. *Cayuga Indian Nation of New York v. Pataki,* 1999 WL 224615, at * 14 (N.D.N.Y. April 15, 1999) ("*Cayuga VIII*") (emphasis added).

great liberties with prior rulings in this case.

To be sure, the consideration issue has previously arisen in this litigation. In making their law of the case argument, the Cayugas point to two separate passages in two different decisions of this court,[4] arguing that therein "this court has ruled that any additional consideration the Cayugas may have received is *irrelevant* for purposes of a violation of the Nonintercourse Act, and that such evidence is 'completely immaterial[.]'" Pl.Supp.Memo. at 8 (emphasis added) and 9. Of course, as will be seen, this prior ruling does not impact the issue of consideration in the context of damages, an issue which was most decidedly *not* before the court in those earlier decisions.

■ There simply is no basis for barring evidence of additional consideration based upon the law of the case doctrine. First of all, as this court has recognized on several prior occasions, including most recently in *Cayuga X,* 1999 WL 509422, at *9, "the law of the case doctrine is not a commandment etched in stone." (internal quotation marks and citations omitted). It is, "at best, a discretionary doctrine, which does not constitute a limitation on the court's power, but merely expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon.'" *Id.* (quoting *LNC Investments, Inc. v. First Fidelity Bank, N.A.,* 173 F.3d 454, 467 n. 12 (2d Cir.1999)). Therefore, assuming for the moment that the passages upon which the Tribal plaintiffs rely to establish the law of the case did in fact hold as they suggest, that is, that consideration is irrelevant and immaterial to the issue of damages, given the discretionary nature of the law of the case doctrine, that doctrine does not necessarily bar this court from reconsidering that alleged determination.

There is, however, even a more significant reason why the Tribal plaintiffs' law of the case doctrine argument is misplaced. That is, as previously alluded to, the fact that while this court has held that consideration is "irrelevant," it did so in the context of an issue which is completely different than the damage issues which are presently before the court. In *Cayuga III,* this court held that any additional consideration which the Cayugas may have received over the years "has no bearing *on the issue of whether there was compliance*

---

4. First, the Tribal plaintiffs rely upon the following passage in *Cayuga III:*

What must not be lost sight of in this discussion is that any conveyance of land in contravention of the dictates of the Nonintercourse Act is invalid, as if it did not occur at all. Because either plaintiff tribe sought additional consideration for the land, or even received such consideration, does not place an imprimatur of validity on the conveyances. The receipt of additional monies is of no bearing on the issue of whether there was compliance with the Act.
Therefore, even if the doctrine of election of remedies were generally accepted in federal practice, which it is not, the court concludes that it is inapplicable here. Neither plaintiff was afforded a true choice of remedies, as the receipt of additional consideration is no remedy at all for an invalid conveyance of land. *Cayuga Indian Nation of New York v. Cuomo,* 667 F.Supp. 938, 946 (N.D.N.Y.1987) ("*Cayuga III*").

Second, the Tribal plaintiffs point to the following passage in *Cayuga VII* as further support for their argument that any mention of additional consideration is barred by the law of the case doctrine:

The court notes that the mere fact that the Cayugas may have attempted to obtain additional compensation under the 1795 and 1807 "treaties" between these two parties did not, by itself, make these agreements legally enforceable treaties. As this court has already held, the United States, and the United States alone, has the legal power to consent to the alienation of tribal land. *See Cayuga III,* 730 F.Supp. at 488 (citing 25 U.S.C. § 177). The federal government never consented to the Cayugas' attempt to convey the subject land to New York in 1795 and 1807. *Id.* at 493. Any actions of the Cayugas to secure additional compensation pursuant to these invalid agreements did not magically transmogrify such invalid agreements into valid treaties which ceded rights in the subject land to the State of New York.
*Cayuga VII,* 771 F.Supp. at 22 n. 5

*with the [Nonintercourse] Act.*" *Cayuga III,* 667 F.Supp. at 946 (emphasis added). Furthermore, at that same time, relatively early in this litigation, the court recognized the possibility that if they prevailed on liability, the Tribal plaintiffs receipt of "additional consideration may become pertinent to the issue of damages." *Id.* at 946 n. 7.

The validity of the treaties under the Nonintercourse Act is a completely separate and distinct issue from the amount of damages to which the Tribal plaintiffs may now be entitled. Likewise, also in the context of an issue wholly apart from damages, in *Cayuga VII,* this court did observe that the Tribal plaintiffs' efforts to secure additional consideration "did not magically transmogrify such invalid agreements into valid treaties[.]" *Cayuga VII,* 771 F.Supp. at 22 n. 5. But again, the issue of the relationship, if any, between the validity of the treaties and any consideration paid by the State simply has no bearing on the damage issues which are the subject of these motions. Therefore, the fact that this court has held that the State's consideration is irrelevant to the validity of the treaties under the Nonintercourse Act is *not* the law of the case with respect to the entirely separate issue of damages. *Cf. Colonial Tanning Corp. v. Home Indemnity Co.,* 780 F.Supp. 906, 912 (N.D.N.Y. 1991) (prior ruling on discovery issue did not establish the law of the case with respect to whether a suit had been brought, thus triggering a duty to defend, where the existence of a suit was simply assumed for purposes of those discovery disputes, but not critical in terms of resolving those disputes). Accordingly, the court rejects the Tribal plaintiffs' argument that the law of the case doctrine bars evidence of consideration which the State has purportedly paid to the Cayugas both at them.

### 2. *"Illegal Contract"*

The Tribal plaintiffs' argument that the State actually committed "criminal activity" in treating with them in 1795 and 1807 is premised upon the following selected passage from the 1793 Nonintercourse Act ("the 1793 Act"):

> "[I]t *shall be a misdemeanor,* in any person not employed under the authority of the United States, in negotiating such treaty or convention, punishable by fine not exceeding one thousand dollars and imprisonment not exceeding twelve months, directly or indirectly to treat with any such Indians, nation or tribe of Indians, for the title or purchase of any land then held, or claimed[.]"

Nonintercourse Act, ch. 19, § 8, 1 Stat. 330 (1793) (emphasis added). Relying upon this language, the Tribal plaintiffs argue that "the State actually committed crimes when it 'purchased' land from the Cayugas in 1793[sic] and 1807." Pl.Supp.Memo. at 13. Based upon that assumption, which, as will be seen, is unfounded, the Tribal plaintiffs further argue that the State should not be allowed to benefit from this asserted criminal conduct by introducing evidence at trial of consideration which it has purportedly paid to the Tribal plaintiffs in connection with the 1795 and 1807 conveyances—conveyances which they deem "illegal." *Id.* at 14.

▮ There are two fundamental flaws with the Tribal plaintiffs' argument based upon section eight of the 1793 Act. First, they are misconstruing both the scope and import of section eight. This court has previously declared, as the State is quick to point out, that this particular provision is not penal or punitive in nature. *See Cayuga Indian Nation of New York v. Cuomo,* 565 F.Supp. 1297, 1327–28 n. 15 (N.D.N.Y.1983) ("*Cayuga II* "). Thus, the court does not find persuasive the Tribal plaintiffs' attempts to characterize the State's violations of the Nonintercourse Act as criminal, such that the. State should not be allowed to introduce evidence of consideration which it allegedly has paid to the Tribal plaintiffs over the

years.[5]

Besides the fact that the section eight is not penal, there is a strong argument to be made that that section does not apply here, where it was the State and not an individual person which entered into the 1795 and 1807 transactions. Under section eight, only "persons" who did not negotiate, etc. in conformity therewith when purchasing, granting, leasing or otherwise conveying land with Indians, could be found guilty of a misdemeanor. To determine whether the State is a person within the meaning of section eight, the " 'starting point' must be the language of the statute itself." *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). Section eight expressly refers to "[a]ny *person* not employed under the authority of the United States[.]" Nonintercourse Act, ch. 19, § , 8, 1 Stat. 330 (1793) (emphasis added). The Nonintercourse Act does not define person, and, as with many other aspects of that Act, the legislative history provides no insight.

A careful reading of section eight in its entirety reveals, however, that immediately following the misdemeanor language, upon which the Tribal plaintiffs so heavily rely, that statute did allow "state agents" to enter into a treaty for land with the Indians so long as there was a federal presence. *Id.* Thus, when Congress used the word "person" in section eight in connection with making certain transactions with Indians misdemeanors, it did not intend to include the states because later in that same section it expressly refers to "stage agents." This choice of words evinces a congressional intent to distinguish between persons and states insofar as section eight is concerned. Consequently, because the court is not convinced that the word "person" in section eight refers to states, and because it has previously held that that section is not penal in nature, it declines to hold that section eight bars evidence of additional consideration paid by the State here.

█ The second fundamental flaw with the Tribal plaintiffs' argument against allowing consideration evidence is their assumption that the 1795 and 1807 conveyances were "illegal contracts." From there, the Tribal plaintiffs devote a relatively lengthy portion of their memorandum to arguing (as they did again during oral argument) that illegal contracts cannot be enforced, and hence this court should not allow consideration evidence. The Tribal plaintiffs are conveniently overlooking the fact, however, that as a result of a Nonintercourse Act violation, such as occurred here in 1795 and again in 1807, those conveyances are "void *ab initio.*" *Oneida County, N.Y. v. Oneida Indian Etc.,* 470 U.S. 226, 245, 105 S.Ct. 1245, 1257, 84 L.Ed.2d 169 (1985). In other words, it is as though those conveyances never occurred. Thus, because of the obvious differences between the unique circumstances of the 1795 and 1807 conveyances, and what transpired in their aftermath, the court finds inapposite the "illegal contract" case law cited by the Tribal plaintiffs in support of their argument for precluding consideration evidence. In short, because the initial conveyances are a legal nullity, the State is not barred from producing evidence of consideration which it paid in connection

---

**5.** An additional component of the State's law of the case argument is that in its view this court also held in *Cayuga II* that the misdemeanor language of section eight became unenforceable once that statute was repealed, and hence on that basis, evidence of additional consideration should be excluded. Contrary to what the State asserts, however, the court was not so unequivocal on the repeal issue. Instead, the court simply observed that "it *may* well be that section [8] which im- posed upon violators a 'fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months' became unenforceable once that statute was repealed (or at least once the savings clause expired)." *Cayuga II,* 565 F.Supp. at 1328 n. 15 (emphasis added). Whether or not section eight was repealed, the court is not convinced that that section bars the State's proposed evidence regarding consideration.

therewith. Consequently, the court denies this motion to exclude such additional consideration evidence and, necessarily, it also denies the Tribal plaintiffs' motion to the extent they are seeking a declaration that the State should not be credited with any such payments.

The court hastens to add, however, that nothing in its ruling here today in connection with consideration should be interpreted as allowing wholesale the testimony of Mr. Dorchester or any other witness whom the State intends to call on the issue of consideration. As with all proffered evidence, there will have to be an adequate foundation for the same and a sufficient evidentiary basis. In other words, the court's ruling today with respect to consideration evidence is limited to a finding that neither the law of the case doctrine nor the misdemeanor language of section eight bars such proof. That is all.

### C. von Gernet

The State intends to call as an "expert" witness Professor Alexander von Gernet, a professor of anthropology, whom it refers to as an "ethno-historian." St.Opp.Memo. at 25. In sum, von Gernet will testify as to the historical relationship between the Tribal plaintiffs and the State from the time of the Revolutionary War until the turn of the century. State Defendants' Pre–Trial Submission ("St.Wit.List") at 6, ¶ 18. Based upon the dealings between the Tribal plaintiffs and the State during that time, von Gernet will opine, among other things, (1) "that the State's payment to the Cayugas in connection with the 1795 and 1807 treaties was reasonable[;] (2) that the total payments made constitute the most accurate measure of fair market value at the time[;] and (3) that the State acted in good faith in connection with its dealings with the Cayuga *both* at the time of the treaties *and* during the period that preceded the treaties." *Id.* at 6–7, ¶ 18 (emphasis added). Further, von Gernet will "testify concerning the Cayuga's understanding and knowledge of their poten-

tial right to seek additional compensation and return of the land, steps taken by the Cayuga during the 19th and 20th centuries to assert such interests and the involvement, if any, of the federal government." *Id.* at 7, ¶ 18. Without such evidence, the State contends that the jury will be forced, improperly, "to decide this case in a historical vacuum." St.Opp.Memo. at 24.

For different reasons, both the Tribal plaintiffs and the United States are moving to exclude von Gernet's proposed testimony. For the moment, the court will focus only on the Tribal plaintiffs' motion in this regard.

Once again, the Tribal plaintiffs invoke the law of the case doctrine. The thrust of this argument is that through the years this court has discussed, in several different contexts, various historical aspects of this lawsuit, and von Gernet should not be able to challenge, or, even at a minimum, offer a differing historical interpretation in this damage phase of the litigation. To do so would, in the Tribal plaintiffs' opinion, result in the jury impermissibly relitigating liability issues upon which this court has previously ruled. *See* Pl.Supp.Memo. at 8.

More specifically, the Tribal plaintiffs point to several aspects of von Gernet's proposed testimony which they believe "ignore" the court's prior rulings in this case. *Id.* at 4. First, as the Tribal plaintiffs read von Gernet's report, he "turns history on its head" by concluding that the underlying purpose of the 1794 Treaty, among others, "was to protect the State's preemptive rights." *Id.* (citing von Gernet Rpt. at 41). This, according to the Tribal plaintiffs, is contrary to an earlier ruling by this court wherein it explicitly stated that "[t]he Treaty of Canandaigua was simply an assertion by the federal government of its superior authority over matters involving Indian affairs granted to the federal government by the Constitution[.]" *Id.* at 5 (quoting *Cayuga Indian Nation of New York v. Cuomo,* 758 F.Supp. 107, 116 (N.D.N.Y.1991)) ("*Cayuga V*").

Anticipating that von Gernet will be testifying as to the State's actions when this country was operating under the Articles of Confederation, the Tribal plaintiffs further contend that the court has already ruled that such testimony is irrelevant, and thus he should be precluded from testifying on that issue. *Id.* at 6 (quoting *Cayuga V*, 758 F.Supp. at 116). Next, the Tribal plaintiffs challenge the relevancy of von Gernet's proposed testimony that some of them sided with the British during the Revolutionary War.

Further, as the Tribal plaintiffs interpret von Gernet's proposed testimony, he intends to testify as to their supposed physical abandonment of the subject property. Such testimony would, in the Tribal plaintiffs' view, directly contradict an earlier ruling by this court wherein it rejected the State's abandonment defense, finding that because the Tribal plaintiffs have "recognized," as opposed to "aboriginal" title, "evidence of the[ir] physical abandonment of the subject land [wa]s both irrelevant and immaterial[.]" *See Cayuga V*, 758 F.Supp. at 117. Given these prior court rulings in the liability phase of this lawsuit, the Tribal plaintiffs contend that the court should bar von Gernet's testimony in the upcoming damage trial.

The State's response is two-fold. First, it accuses the Tribal plaintiffs, as well as the U.S., of "unfairly characteriz[ing]" von Gernet's deposition testimony and report, St.Opp.Memo. at 30, a point which it emphatically repeated during oral argument. Second, and more important, the State responds that von Gernet's historical testimony is *not*, as the Tribal plaintiffs suggest, being offered to refute prior legal determinations by this court. Rather, von Gernet "scrupulously limited his opinions to historical issues and did not profess to reach legal conclusions, including conclu-

sions about the primacy of state or federal law." St.Opp.Memo. at 32.

The Tribal plaintiffs' argument to preclude von Gernet's testimony based upon the law of the case doctrine is misplaced. First of all, the court cannot help but observe that the Tribal plaintiffs seem to invoke this doctrine only when they deem it advantageous to do so. Thus, where, as here, the Tribal plaintiffs believe that the court has previously ruled favorably to them on certain issues, they invoke the law of the case doctrine to argue that the testimony of a State's witness, such as von Gernet, should be precluded. On the other hand, in addressing the issue of subsequent State payments to the Tribal plaintiffs, another subject of the present motions, these plaintiffs argue that certain statements by the court which they believe are *dis*advantageous to their position do *not* constitute the law of the case.[6]

■ In any event, because of the discretionary nature of this doctrine, which this court has repeatedly recognized, including earlier in this litigation, that doctrine is *not* a sound basis for granting the Tribal plaintiffs' motion to preclude. Furthermore, if the court accepts the view, despite the Tribal plaintiffs' protestations to the contrary, that von Gernet's historical testimony *is* relevant, then the law of the case doctrine would not bar the same because in the prior decisions upon which they place so much credence, the issue most decidedly was *not* one of damages. For example, the Tribal plaintiffs maintain that von Gernet should not be allowed to testify as to the State's actions while this country was operating under the Articles of Confederation, because purportedly this court has already held that such evidence is irrelevant. To be sure, in *Cayuga V*, this court did state that "any actions taken by

6. For example, despite the fact that this court explicitly stated in *Cayuga VIII* that it "will ... allow proof as to whether the Cayugas received sufficient consideration" for the July 27, 1795 conveyance, *Cayuga VIII*, 1999 WL 224615, at *14, the Tribal plaintiffs argue that

there is still an open issue here as to "whether the State is legally entitled to be credited with such payments[.]" Pl.Supp.Memo. at 10. Selective reliance upon the law of the case doctrine significantly weakens the validity of this argument, regardless of the issue.

the State relating to the Treaties of Fort Stanwix and Harmar—treaties which were entered into while this Nation was operating under the Articles of Confederation—are irrelevant[,]" but the Cayugas overlook the fact that the court specifically made that relevancy determination in the context of "interpreting the rights conferred by the 1794 Treaty of Canandaigua." *Cayuga V*, 758 F.Supp. at 116. The court there did not hold that such evidence was irrelevant to the issue of damages, the issue which now concerns the court. Thus, although through the years the court, necessarily made certain pronouncements as to the historical context of this dispute, the law of the case doctrine does not mandate the conclusion that the same are binding in this entirely different damage context. *Cf. Colonial Tanning*, 780 F.Supp. at 912. Thus, the court denies the Tribal plaintiffs' motion to preclude the testimony of Professor von Gernet based upon the law of the case doctrine.

So, insofar as the Tribal Plaintiffs' motions are concerned, the court grants their motion to amend their respective complaints to add the State itself as a defendant; the court also grants their motion for partial summary judgment as to liability against the State. However, the court denies the Tribal plaintiffs' motion seeking to preclude evidence of additional consideration. Likewise, the court denies the Tribal plaintiffs' motion, based upon the law of the case doctrine, to preclude Professor von Gernet's testimony.

## II. U.S.

Through its motions *in limine*, the U.S. seeks the following: (1) a declaration that the measure of damages should be the "valuation of the subject lands as an aggregated single unit based upon the fair rental value for the use and occupancy of the subject property in its 'unimproved' state from 1795 to the present, *plus* its present-day value in a similarly 'unimproved' state; and declaring and excluding any evidence to the contrary," which the State seeks to introduce; (2) reserving to the court all issues of law and equity, leaving only fact issues as to the amount of damages for the jury; (3) a declaration that the State acted in bad faith; and (4) a declaration that the proposed expert report and testimony of professor von Gernet be "excluded as irrelevant and lacking in adequate foundation." U.S. Notice of Motion at 2, ¶ 1 (emphasis added) and 2, ¶ 4.

The court will first address the bad faith issue. It will then address the U.S.'s motion pertaining to Professor von Gernet, which, as will be seen, encompasses, to some extent, the U.S.'s motion to reserve all equitable issues for the court's consideration. Last, but not least, the court will turn to a consideration of not only the U.S.'s motion as to valuation methodology, but also the State's motion in this regard because, as will be seen, these arguments are really two sides of the same coin.

### A. Bad Faith

■ The United States contends that the fact that this court has held that the State violated the Nonintercourse Act in 1795 and again in 1807 when, without a federal presence, it entered into treaties with the Cayugas, results in "a *conclusive presumption* of [the State's] bad faith." U.S.Supp.Memo. at 19 (emphasis added). On that basis the U.S. is seeking a declaration that the State acted in bad faith, and hence "the evidence should be so limited to reflect this finding[.]" *Id.* During oral argument, the U.S. clarified the scope of this bad faith argument. By seeking a definitive pre-trial ruling that the State acted in bad faith, the U.S. is attempting to preclude the State from seeking an offset for the benefit of its infrastructure improvements.

In support of this argument, the U.S. relies upon the liability trial of the *Oneida* test case before Judge Port, as well as the Second Circuit's decision in *Oneida Indian Nation of New York v. Oneida County*,

719 F.2d 525 (1983).[7] During the course of the *Oneida* liability trial, Judge Port stated that "[t]he bad faith consisted of the violation of the Non–Intercourse Act by the State[.]" Plaintiff–Intervener [sic], United States', Opening Memorandum in Support of its Motions in Limine ("U.S.Supp.Memo.") at 18 (citing *Oneida* Trial Transcript at 167a). During the course of that trial, Judge Port further observed that the State acted in bad faith based upon its "knowledge of the requirements of the Non–intercourse Act … and much historical data to support that law." *Id.* Given these remarks, as well as the prior liability determinations in the present case, the U.S. argues, citing no case law directly on point, that a Nonintercourse Act violation "in and of itself raises, as a matter of law, a *conclusive presumption* of [the State's] bad faith." *Id.* at 19 (emphasis added).

In response, the State declares that the "plaintiffs have failed to establish that, as a matter of law, [it] acted in bad faith[,]" reasoning that "a finding that [it] violated the Nonintercourse Act in 1795 and 1807 is *not*, by itself, conclusive evidence that it also acted in bad faith." St.Opp.Memo. at 16 and 17 (emphasis added). As with the U.S., the State does not offer any case law to support this broad assertion. Despite that lack of precedent, the court agrees with the State however. In this particular case, at this particular juncture, Judge Port's remarks in *Oneida* certainly do *not* compel a finding of bad faith on the part of the State. There are a number of flaws in this argument by the U.S.

For one thing, Judge Port's remarks were made during the course of the *Oneida* liability trial, *not* during the trial on damages. And, as should be abundantly clear by now, in part because of the unique nature of this land claim litigation, findings in the liability phase of such litigation are not necessarily conclusive with respect to the later damage phase. Furthermore,

different treaties were at issue in *Oneida* than are at issue in the present case.

What is more, even if this court were inclined to find that Judge Port's remarks should be given binding effect in this case, the State's status in *Oneida* was markedly different than its status herein. There, the State was a third-party defendant for indemnification purposes; it was not a party to either the liability or damage phases of the *Oneida* litigation. That difference in the State's party status renders Judge Port's remarks all the more superfluous in the present context where, for now, the State is the sole defendant, potentially liable for a significant monetary judgment.

■ Judge Port's observations in *Oneida* also do not support a finding here that the State, as a matter of law, acted in bad faith because in *Oneida* the Supreme Court eventually dismissed the State from the third-party action on Eleventh Amendment grounds. Therefore, that dismissal in and of itself would be sufficient to deprive Judge Port's remarks of preclusive effect in this action because, "[a] 'judgment vacated or set aside has no [such] effect.'" *Motrade v. Rizkozaan, Inc.*, 1998 WL 108013, at *85 (S.D.N.Y. March 11, 1998) (quoting *Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir.1992) (other citations omitted)). In sum, the court denies the U.S.' motion seeking a declaration that the State acted in bad faith after the initial transactions, and necessarily it also denies the U.S.' motion *in limine* to the extent it seeks to preclude the State from offering evidence of the State's good faith in this regard.

As an aside, the court observes that in any event, ordinarily the issue of bad faith raises factual issues which are more appropriate for consideration by a finder of fact. *See, e.g. Ally Gargano/MCA Advertising, Inc. v. Cooke Properties, Inc.*, 1989 WL 126066, at *10 (S.D.N.Y. Oct.13, 1989) (plaintiff raised a factual issue precluding summary judgment as to whether the de-

---

7. Subsequent history omitted.

fendant acted in bad faith in performing its obligation reasonably to consent to proposed subleases); *King v. Carlesimo*, 662 N.Y.S.2d 838 (2d Dep't 1997) (the large discrepancy between the price paid for some cooperative apartments and the market value of those apartments created a jury question on the issue of whether those apartments were conveyed in bad faith). And nothing before the court on these motions persuades the court to disregard this well-settled rule.

### B. von Gernet

As previously mentioned, like the Tribal plaintiffs, the U.S. also seeks to exclude the testimony of Professor von Gernet, but for different reasons than the Tribal plaintiffs.[8] The U.S. offers three reasons, which the court will address in turn, as to why von Gernet's testimony should be excluded. Assertedly, von Gernet "lacks any foundation to testify regarding the damages issues." U.S.Supp.Memo. at 20. Furthermore, his proposed testimony, which attempts to place this dispute in historical context, supposedly is irrelevant. And finally, through von Gernet's testimony, the State impermissibly seeks to introduce equitable factors into the calculation of monetary damages.

### 1. Qualifications

██ Because von Gernet is neither an economist nor an appraiser, the U.S. asserts that he is not qualified to testify as to the issues which will be the focus of the upcoming damage trial: (1) fair rental value of the subject land for the past approximately 200 years; (2) the sufficiency of the consideration which the Tribal plaintiffs received in 1795; and (3) the fair market value of that land as of July 27, 1795.

Likewise, von Gernet's testimony lacks a proper foundation, the U.S. contends, because he has no training, skill, experience, etc. in land valuation. In this regard, the

U.S. notes that during his deposition, von Gernet candidly admitted, among other things, that he has no opinion as to "what, if any, relief the Cayuga are entitled to." U.S.Supp.Memo. at 20 (quoting von Gernet Dep. at 60, 1. 3–14) (other citations omitted). Nor, the U.S. contends, does von Gernet have an opinion as to the issues identified above because as he explained during his deposition, in his view, those issues all involve "hypotheticals." *Id.* at 22 (citing von Gernet Dep. at 113, 1. 2–9).

Even if von Gernet had not readily conceded that he has no opinion on these damage issues, the U.S. contends that to fulfill its "gatekeeping function" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), this court should exclude von Gernet's, testimony because, among other reasons, he " 'lacks any knowledge or experience' to render opinions to the damage issues which will be the focus of the upcoming trial." U.S.Supp. Memo. at 24 (footnote omitted).

As is evident from the U.S.'s and the State's respective motion papers, as well as their comments during oral argument, there is a great deal of disagreement between these two parties as to exactly what von Gernet said during his deposition, and likewise how that testimony should be interpreted. When all is said and done, however, because it appears to the court that the U.S. is challenging Dr. von Gernet's qualifications to testify, only insofar as he might testify regarding economics, appraisals or land valuation, and because the State is **not** offering von Gernet as an expert on those topics, *see* St.Opp.Memo. at 35, the court will not preclude von Gernet's testimony on the basis that he is not qualified. Furthermore, again assuming that his testimony is otherwise admissible, given that, as one commentator has recently noted, "[t]he types of expert witnesses are virtually limitless[,]"[9] the fact that von

---

8. The Tribal plaintiffs do, however, join in these arguments for preclusion of von Gernet's testimony, as they stressed during oral argument.

9. Cynthia H. Cwik, *Guarding the Gate: Expert Evidence admissibility*, LITIGATION, Sum. 1999, Vol. 25, No. 4 at 6.

Gernet is an anthropologist by training and education, who has viewed the damage aspect of this litigation through the lens of an "ethno-historian," does not, standing alone, disqualify him from testifying about damage issues. Therefore, at this juncture, the court is not willing to preclude von Gernet's testimony on the basis that he is not qualified.

### 2. Relevancy

■ Second, the U.S. argues for the exclusion of von Gernet's historical proof because assertedly it "is entirely irrelevant to any damages methodologies the court has established" because it does not pertain to "land valuation, appraisal, and economics concepts." U.S.Supp.Memo. at 24 and 25. Rather, according to the U.S., von Gernet's testimony pertains to five "historical themes," which the U.S. deems "the Von Gernet Factors[.]" *Id.* at 24. As defined by the U.S., these factors are: (1) some Cayugas fought for the British during the Revolutionary War; (2) "[a] group of Cayugas left the . . . homeland during the Revolutionary War and never returned;" (3) "[c]ertain Cayugas wished to sell their Cayuga Lake reservation to private individuals and the State in 1795 and 1807;" (4) "[t]he State admirably chose to compensate the Cayugas rather than merely confiscate their lands;" and (5) "[s]ome Cayugas at the time did not question the ability of the State to purchase Indian land unilaterally." *Id.* at 24–25. Additionally, during his November 3, 1999 deposition, the U.S. claims that von Gernet also raised the specter of testifying at trial as to laches—another equitable factor which the U.S. considers irrelevant to the issue of damages. Relying upon the Supreme Court's recognition in *Daubert,* that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful[,]" the U.S. argues that "[t]he Court, in its gatekeeping role, should not allow New York to essentially relitigate liability before the jury by introducing equitable factors bearing no rele-

vance to damages." *Id.* at 26 (internal quotation marks, citations and footnotes omitted).

In general, the State's response is that it should be allowed to present these so-called "equitable factors," given the potentially enormous damages which plaintiffs are seeking—fair rental value of the property for 200 years plus, as well as monetary damages for the current fair market value of the land. Thus, the State vehemently disputes the assertion that von Gernet's testimony is not relevant. von Gernet's testimony *is* relevant, argues the State, because it will assist the jury with respect to the following issues: 1) "the Cayugas' measure of damages at the time of the original conveyance; 2) the Cayugas' claim that they are entitled to 200 years of fair rental value damages; 3) the State['s] . . . defense that it was a good faith purchaser; and 4) any additional damages sought by the plaintiffs, such as current market value to compensate them for the future use and occupancy of the land." St.Opp.Memo. at 29.

Moreover, the State notes that the Tribal plaintiffs are also attempting to offer historical proof through Robert W. Venables, Ph.D. an historian, and the State is *not* challenging the relevancy of this testimony. *Id.* at 26. So, colloquially put, the State's argument is, "What's good for the goose is good for the gander." The State further notes that the Tribal plaintiffs' appraisal experts testified during their depositions that some historical perspective was a part of their respective analyses of fair market value. *See id.* at 27–28. Historical evidence is also relevant, according to the State, to the issue of whether it acted in good faith following the initial transactions. The State believes that it would be "seriously prejudiced" by exclusion of von Gernet's evidence as to historical context because then the jury would have "to speculate as to what conduct of the State has set the stage for this damages hearing." [10] *Id.* at 30.

---

**10.** Of course, this ignores the fact that if the goal here truly is to educate the jury as to the

At this point, the court will limit its discussion of the relevancy of von Gernet's testimony to the issue of the measure of damages at the time of the original conveyances—the first issue in which, according to the State, the jury will be aided by his testimony. The U.S. argues that von Gernet, in effect, views the notion of a fair market value at the time of the original conveyance as a legal fiction. von Gernet opines that the " 'lands had *no* fair market value' because the State held a right of preemption." U.S.Supp.Memo. at 22 (citing von Gernet Rpt. at 68) (footnote omitted) (emphasis added). In the context of this unique litigation, the court has serious doubts as to the relevancy of this testimony. Moreover, a review of von Gernet's deposition and his report, and taking into account the State's and the U.S.'s differing interpretations of the same, the court finds that even if his testimony is relevant to the issue of the fair market value of the land in 1795, in the exercise of its discretion, the court would preclude the same under Fed. R.Evid. 403, because the prejudice of such testimony substantially outweighs its probative value. Furthermore, this testimony would not assist the jurors, and indeed might well confuse them. Therefore, the court grants the U.S.'s motion to exclude von Gernet's testimony on the limited issue of the fair market value of the land in 1795.

The other issues to which the State claims von Gernet's testimony is relevant (fair rental value for past dispossession of the subject property); the claim for current market value of the land; and the State's good faith all, in one way or another, implicate equitable concerns. Therefore, the court will discuss the same in the next section, which addresses the propriety of allowing equitable factors to be introduced at this stage of the litigation.

purpose of the trial, that could just as easily be accomplished through pre-trial instructions, wherein the court advises the jury as to the relevant background of this dispute. Al-

### 3. *Equitable Factors*

Related to the U.S.'s argument that through von Gernet's testimony the State is seeking to impermissibly introduce equitable factors into the calculation of damages, is its argument that if the State is allowed to introduce "new equitable issues," the court and not the jury should consider the same. *See* U.S.Supp.Memo. at 29–31. The State argues that it is entitled to introduce evidence of equitable factors because of the extensive monetary damages which the plaintiffs are seeking herein. Thus, at the very least, the State contends that "the jury is entitled to hear evidence as to the delay of the plaintiffs in asserting their claims in a timely fashion." St.Opp.Memo. at 23. In other words, the State wants the jury to hear evidence pertaining to laches, an equitable defense. *See Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir.1997). Obviously, through such testimony the State is hopeful that it can significantly diminish any potential damage award which a jury might award.

In its opposition memorandum, however, the State cites to no case law mandating that equitable issues, such as laches are within the province of a jury. Instead, the State harkens back to claims of "severe[ ] prejudice" if it is not allowed to present evidence of "delay-based defenses ... at the damages trial." St.Opp.Memo. at 24. In this regard, the State reminds the court that over the years, on numerous occasions, the court has stated that it is keenly aware of the equitable factors which a case such as this implicates. *See, e.g., Cayuga II*, 565 F.Supp. at 1310–11 ("equitable factors will be carefully weighed before any relief is granted"); *Cayuga VIII*, 1999 WL 224615, at *10 ("equitable factors, including laches, will have [a] place in fashioning the remedies in this case, including mone-

though this court does not regularly find it necessary to give such instructions, there is ample justification for doing so here.

tary compensation[ ]"). The court needs no reminding.

■ Ordinarily, "[a] determination as to the applicability of laches is left to the discretion of the trial court[,]" although the appropriateness of that defense must be determined on a case-by-case basis, depending upon the "particular factual situation" of that case. *Soot v. General Elec. Co.*, 681 F.Supp. 157, 162 (S.D.N.Y.1987) (internal quotation marks and citations omitted); *see also Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 931 F.Supp. 1044, 1046 (E.D.N.Y.1996) (patent action wherein the court tried the issues of laches and equitable estoppel, while the jury "tried the issues of ownership, infringement under the doctrine of equivalents, and validity of the asserted claims of the patents-in-suit[ ]"). By way of illustration, in *Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996), the parties agreed to conduct the trial partly before the jury and partly before the judge. In that case, involving copyright ownership, the jury made findings "focus[ing] on the issues of authorship, fraudulent concealment, and duress." *Id.* at 53. Then, among other things, the court resolved "issues relating to the statute of limitations, equitable estoppel, and laches[,]" rejecting the defendants' laches defense, based on plaintiffs' long delay in asserting their claim. *Id.* at 53–54.

■ In light of the foregoing, coupled with the fact that the State does not bring to the court's attention any case law to the contrary, the court denies the State's motion to present evidence to the jury, whether through von Gernet or otherwise, as to the issue of laches and any other such equitable issues which may become relevant. Those equitable issues shall be reserved to the court, and if necessary, the same may be the subject of post-trial motions and/or additional post-trial proceedings before the court, without a jury. By the same token, however, as previously discussed the jury will be allowed to hear von Gernet's testimony relative to the issue of its claimed status as a good faith occupier of the land in the years subsequent to the initial conveyance. The court realizes that proceeding in this way may result in some duplication of testimony, but the court sees no other option given that the State is proffering von Gernet's testimony for both equitable, legal issues, which the court must determine, and for factual issues, such as good faith, which the jury must consider.

## C. Valuation

In effect, both the State and the U.S. are moving to preclude the others' "expert testimony" with respect to property valuation. In particular, the U.S. is seeking a declaration that the measure of damages herein should be based upon a "valuation of the subject lands as an *aggregated* single unit based upon the fair rental value for the use and occupancy of the subject property in its 'unimproved' state from 1795 to the present[.]" U.S. Notice of Motion at 2, ¶1 (emphasis added). By the same token, the State is seeking to "prevent[ ] the plaintiffs' expert appraisal witnesses, John F. Havemeyer, III and Arvel M. Hale, from testifying with respect to valuation and calculation of damages on the grounds that their opinions are based upon data that was formulated in a manner that does not accord with appropriate standards *and* is inconsistent with the Court's [decision in *Cayuga IX*]." St. Notice of Motion at 2, ¶(3). As to the latter, the State contends that plaintiffs' method of calculating damages, based upon an aggregated single unit computation conflicts with *Cayuga IX*, which the State reads as requiring valuation based upon a single bulk parcel.

Before briefly considering these seemingly conflicting valuation methodologies, the court stresses that because it was operating in a factual vacuum when it issued its decision in *Cayuga VIII*, it explicitly stated that it was "impossible [at that time] to set forth in any great detail how monetary damages will [eventually] be determined." *Cayuga VIII*, 1999 WL

224615, at *14. As counsel were reminded during oral argument on the present motions, in *Cayuga VIII*, it went on to explain that "[g]enerally speaking," it intended to proceed with the damages aspect of this litigation "in accordance with the manner set forth therein." *Id.* Now, and especially after the court has the advantage of a *Daubert* hearing, it will be in a better position, if necessary, to determine the proper methodology for calculating damages in this novel case.

The court has carefully examined the parties' respective arguments as to this valuation issue and finds that as presently constituted the record before it is insufficient to allow the court, under the teachings of *Daubert* and its progeny, to make the necessary findings to ensure that such testimony is both reliable and relevant. Accordingly, prior to drawing a jury the court will conduct a hearing on these matters. Such hearing shall commence on January 4, 2000, at 10:00 a.m. at the United States District Courthouse, Syracuse, New York. At that time, the court will hear the proffered testimony of plaintiffs' witnesses Havemeyer and Hale, and the State's witness, Dorchester, and make appropriate rulings in connection therewith.

To conclude insofar as the United States' motions *in limine* are concerned, the court rules as follows. The court denies the United States' motion for a declaration that the State acted in bad faith. As to Professor von Gernet, the court denies the United States' motion to exclude his testimony because he is not qualified. Insofar as the United State's is arguing that von Gernet's testimony should be excluded as irrelevant, the court grants in part, and denies in part this motion. The court finds von Gernet's testimony is relevant as to the State's status as a good faith occupier of the land subsequent to the initial transactions, and, assuming his testimony is otherwise admissible, he will be permitted to testify as to the same at the January, 2000, jury trial. von Gernet's testimony as to the reasonableness of the State's consideration in 1795 and in 1807 is not relevant, however; nor is his testimony as to the fair market value of the land in 1795. Therefore, the court grants the United States' motion to preclude the same. von Gernet also will not be allowed to testify as to the State's alleged good faith purchase status in 1795 and 1807; so this aspect of the United States' motion to preclude is granted. As to von Gernet's proffered testimony pertaining to laches and other such equitable issues, he will be allowed to testify in that regard, if at all, before the court (and not a jury) in any post-trial proceeding which the court might conduct. At this point, the court denies the United States' motion for a declaration that property should be valued based upon an aggregated single unit, and seeking to preclude evidence to the contrary. For the reasons set forth below, however, the court grants the United States' motion insofar as it is seeking a declaration that the plaintiffs are entitled to proffer evidence as to the present-day value of the subject property as "unimproved".

### III. State

#### A. Eleventh Amendment

Once again, the issue of the State's Eleventh Amendment immunity is before the court. This time the State argues that the Eleventh Amendment bars the Tribal plaintiffs from seeking "damages for mesne profits in the measure of loss use and occupancy or rental value damages," as well as damages for mineral depletion beyond the amount sought by the United States. State Defendants' Notice of Motion in Limine at 2, ¶ (1). This argument need not detain the court for long. Consistent with its conclusion in *Cayuga X*, that "regardless of whether the focus is on the issues or claims asserted, the *relief sought* or the subject matter, . . . for all practical purposes the Cayugas' and the United States' complaints are 'virtually identical' so as to defeat the State's Eleventh Amendment immunity," the court de-

nies the State's present motion in this regard. *See Cayuga X,* 1999 WL 509442, at \*13 (quoting *Seneca Nation of Indians v. New York,* 26 F.Supp.2d 555, 564 (W.D.N.Y.1998), *aff'd* 178 F.3d 95 (2d Cir. 1999)). There is nothing in the State's motion papers, nor did the court hear any argument by the State, which convinces the court to change its prior ruling in this regard. Moreover, because the thrust of the State's motion with respect to the natural resource damages is its lack of notice of the same on the part of the U.S., the court is compelled to comment, as it did during oral argument, that this lack of notice argument is disingenuous at best, given the express reference to such damages found in the U.S. complaint in intervention at paragraph three of the wherefore clause.

The court also does not find persuasive the State's argument that the Eleventh Amendment operates to bar the Tribal plaintiffs' use and occupancy damages because the U.S.'s and the Tribal plaintiffs' respective experts purportedly disagree as to the amount of such damages. It is not the amount of damages sought which is significant here, but rather the subject matter or nature of the claims, which, as this court has previously held, are "virtually identical," rendering the Eleventh Amendment inapplicable here. Nor is there any merit to the State's argument that because at one point the U.S. was seeking substantially less than the Tribal plaintiffs with respect to use and occupancy damages, the Eleventh Amendment bars the latter's claimed damages which exceed the scope of the U.S. Again, in the court's view, it is the subject matter or nature of the claims which is dispositive— not the scope of the relief sought. Therefore, the court denies the State's motion to preclude the Tribal plaintiffs from seeking use and occupancy damages beyond those sought by the U.S. Likewise, the court denies the State's motion to preclude the Tribal plaintiffs from seeking damages for mineral depletion. As an aside, however, as to mineral depletion, the court has seri-

ous reservations as to whether there is a sufficient foundation for the plaintiffs' method of computing the same, but the court will cross that bridge when it comes to it.

### B. Current Market Value

■ The State is further seeking to limit plaintiffs' potential recovery in this case by endeavoring to preclude them from offering evidence of the current market value of the subject land. The State's primary objection to such evidence is that it is simply too late for the plaintiffs to be seeking such relief. This argument is baseless. First of all, as the U.S. responds, the availability of damages for current market value did not definitively become an issue until July, 1999, when this court rejected ejectment as a possible remedy here. Only at that point, were the plaintiffs certain that any damages which they are seeking to recover would have to be structured to take into account the fact that they would not be repossessing the subject property—property which in previous rulings this court has determined was taken from them in violation of the Nonintercourse Act.

There is an additional reason for finding that the plaintiffs are entitled to offer evidence (assuming it is otherwise admissible) as to the current market value of the land; and that is if plaintiffs are denied the same, there is a very real possibility that the Tribal plaintiffs would seek damages, through the commencement of a new lawsuit or otherwise, for a continuing violation of their federal right to possession. Thus arguably, this lawsuit, which was commenced late in the 20th century and is about to continue into the 21st, would never end.

### C. Lay Witnesses

■ The State is seeking to "strike" the following lay witnesses identified in the Tribal plaintiffs' pre-trial witness list: Patty Harjo·Shinn, Hazel Wallace, Clint Half-

town and Kevin Gover. St. Notice of Motion at 2, ¶ 4. Basically these witnesses are being offered to establish that the Tribal plaintiffs have sustained emotional, psychological and cultural damages due to the loss of their ancestral homeland. While the Tribal plaintiffs' attempts to proffer this type of testimony are understandable, the fact remains that the same is not only speculative, but its probative value, if any, is substantially outweighed by its prejudice. Furthermore, such testimony is of questionable relevance to the issues of property valuation which are the subject of the upcoming trial. Therefore, in accordance with Fed.R.Evid. 403, the court grants the State's motion to preclude the testimony of these four witnesses.

### E. Hill and Venables

As to Bernadette Hill and Robert Venables, the State seeks to limit their testimony insofar as it too is being offered to establish the emotional, psychological and cultural damages allegedly sustained by the Tribal plaintiffs due to the loss of their ancestral homeland. Obviously, the court grants this aspect of the State's motion to preclude. As the State concedes, however, its "expert" historian, Dr. Venables, and Ms. Hill should be allowed to testify as to what actions, if any, the Tribal plaintiffs took to assert their rights in the years after the initial transactions. The court will not allow such testimony at the upcoming jury trial, however, given that it is relevant to laches—an issue which the court has already determined is equitable, and hence not a jury issue. Ms. Hill and Dr. Venables may testify at the jury trial, however, to the extent that the testimony of either is relevant given the court's rulings herein.

### F. Apportionment

Finally, concerned about the possibility of being subjected to damages "more than once for the same wrong," and the possibility of future satellite litigation in the event damages are awarded against it, the State is moving "to apportion any award of damages among all Cayuga Tribes derived from the historic Cayugas but only to the extent that any other Tribe makes application, upon notice, to participate in any damages award and is determined by this Court to be entitled under federal law to participate in such relief." State of New York Defendants' Memorandum of Law in Support of their Motion in Limine ("St. Supp.Memo.") at 44. Assuming such a motion could be properly made before this court, the court denies the same without prejudice to renew.

For the reasons set forth herein, the court denies both the State's and the United States' respective motions *in limine* as to the methodology which will be employed for calculating damages at the trial. Instead, as explained herein, the court will conduct a *Daubert* hearing on these issues. The court denies the State's motion to preclude plaintiffs from presenting evidence as to the current market value of the subject property. However, the court grants the State's motion to strike the testimony of Patty Harjo Shinn, Hazel Wallace, Clint Halftown and Kevin Gover. The court also grants the State's motion to disallow the testimony of Bernadette Hill and Dr. Robert Venables with respect to the emotional, psychological, and cultural damages which the Tribal plaintiffs allegedly sustained as a result of the loss of their ancestral homeland. Finally, the court denies without prejudice to renew the State's motion to apportion among all Cayuga Tribes any damages that may be awarded.

IT IS SO ORDERED.